## UNITED STATES v. CARROZZO et al.
### No. 32271.

District Court, N. D. Illinois, E. D.
Feb. 4, 1941.

Judgment Affirmed April 7, 1941.

See 61 S.Ct. 839, 85 L.Ed. ——.

Thurman Arnold, Asst. Atty. Gen., and J. Albert Woll, U. S. Atty., and Leo F. Tierney and Daniel B. Britt, Sp. Assts. to Atty. Gen., all of Chicago, Ill., Richard P. Shanahan and Thomas H. Daly, Sp. Assts. to Atty. Gen., both of Washington, D. C., and David R. Mason, Sp. Asst. to Atty. Gen., of Chicago, Ill., for the United States.

Joseph R. Roach and Samuel H. Shapiro, both of Chicago, Ill., for defendants International Hod Carriers, Building & Common Laborers District Council of Chicago and Vicinity and others.

Hartshorn, Thomas, Abele, Phillips & Mitchell, of Cleveland, Ohio, and Nash & Ahern, of Chicago, Ill., for William E. Maloney and others.

SULLIVAN, District Judge (after stating the facts as above).

Objections third and fourth as to substance, and objection fifth, will be first considered.

The offense charged in the present indictment is a combination and conspiracy in restraint of trade, in violation of Section One of the Sherman Act, 15 U.S.C.A. § 1, which provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

The indictment charges the defendants with "knowingly having entered into and engaged in a combination and conspiracy unreasonably to prevent persons, partnerships and corporations engaged in the manufacture of truck-mixers in states other than the State of Illinois, from selling and delivering truck-mixers in, and shipping the same to the Chicago area, where they would enter into competition with other types of equipment, machines and devices employed in the production of concrete, and where their use would result in the reduction of the cost, and an improvement of the quality of concrete to consumers, which conspiracy and combination in fact has been and is now in restraint of trade and commerce in truck-mixers among the several states." Then follows a detailed description of the means used to effectuate the combination and conspiracy, such as strikes, and threats of strikes, to prevent the use of truck-mixers in the Chicago

area; warnings to contractors in the Chicago area that defendant Union would prohibit the use of truck-mixers in the Chicago area unless in each instance of their use they were manned by one of its engineer members; the use of threats to force paving contractors in the Chicago area to enter into working agreements with the Union of Operating Engineers providing that in the event truck-mixers were used, the contractors would employ the same number of men as would be employed if truck-mixers were not used. The indictment then sets out that "the aforesaid conspiracy, and the acts performed by the defendants, were not intended to increase wages, shorten hours of labor, better working conditions, or promote or effectuate any other legitimate or normal object of a labor union."

Defendants insist that on the contrary, in doing the acts with which they are charged they were carrying out the legitimate and normal objects of a labor union, in that they were attempting to prevent the dismissal of any of their members where contractors in the Chicago area were using what are alleged in the indictment to be labor saving truck-mixers. It appears that truck-mixers are concrete mixers mounted on trucks, which either mix the cement or agitate pre-mixed cement en route to a job, while "the other type of mixers" are located at the job site and may be mounted on tractors or other conveyances which move about the job site, or are stationed at some fixed place on the job site. One type mixes or agitates the ingredients while going to the job site, while the other type operates and does the mixing only at the job site, where it has been the practice to employ a member of the International Union of Operating Engineers to operate them. Use of truck-mixers attempts to do away with the services of this engineer, who has for years had jurisdiction of the operation of "the other type of cement mixers". The indictment alleges, and the Government contends, that the use of truck-mixers would result in a savings of labor costs through reduction of the number of men employed. Defendants insist that this is exactly what they are objecting to, and the purpose of the strikes, or threatened strikes, was to compel cement contracts in the Chicago area to accede to the Union's demands that the services of these engineers be retained on jobs where truck-mixers are used; that these are activities within the legitimate objects of a labor union. That these activities grew out of a "jurisdictional labor dispute" between the members of the International Union of Operating Engineers Local 150, whose members operate the mixers, and the Teamsters' and Chauffeurs Union, whose members operate the trucks, in which dispute the Engineers Union has refused to relinquish jurisdiction over truck-mixers, which are essentially concrete mixers, and over which the Union has for years had jurisdiction. There appears to be nothing unreasonable in these demands, and only lawful means seem to have been used to accomplish them. I am of the opinion that defendants, under such circumstances, are immune from prosecution under the Sherman Act, by reason of the provisions of the Norris-LaGuardia Act, which enlarges the scope of Section 20 of the Clayton Act. The Sherman Act was modified by the Clayton Act of October 15th, 1914. Section 6 of the Clayton Act, Title 15, Sec. 17, U.S.C.A., provides that a labor organization, or the members thereof, shall not be held or construed to be an illegal combination or conspiracy in restraint of trade, under the anti-trust laws.

Section 20 of the Clayton Act, Title 29, Sec. 52, U.S.C.A., regulates the granting of restraining orders and injunctions by United States Courts in a designated class of cases, with respect to the character of acts which are exempt, and also provides that none of the acts specified therein shall be considered or held to be violations of any law of the United States.

The Norris-LaGuardia Act, Title 29, Sec. 105, U.S.C.A., enlarged the scope of the Clayton Act and prohibits any court from issuing an injunction on the ground that any person or persons participating in a labor dispute are engaged in an unlawful combination or conspiracy because of the doing of certain acts.

Defendants contend that no facts are set out in the instant indictment which show any unreasonable or injurious restraint of trade, such as is condemned by the Sherman Act. It must clearly appear from the indictment that the activities with which defendants are charged are such as unreasonably restrain interstate commerce and prejudice the public interests, and are not activities which come within the normal, legitimate and lawful activities

which may be employed by a labor union, and which, under Sections 6 and 20 of the Clayton Act, and the Norris-LaGuardia Act, are exempt from prosecution under the Sherman Act. Such normal, legitimate and lawful activities of a labor union include the calling of strikes, or threatening to call strikes, in order to enforce their demands, as in the present case a demand against the use of labor saving devices which will displace their members; or, in the alternative, the demand that if the labor saving device is used the same number of men be employed as would be if the other type of mixer were used. These are legitimate and lawful activities which a labor union is permitted to carry on in an effort to maintain employment and certain working conditions for its members, and any restraint of trade or commerce attendant thereon is only indirect and incidental. Nothing unreasonable appears in the demands of the Engineers' Union. It has for many years had jurisdiction of concrete mixers, and it has as much right on the one hand to demand that its members continue to operate the mixers, as the Teamsters' and Chauffeurs' Union on the other hand has the right to demand that its members now be permitted to operate the truck-mixers. In the case of Terrio v. S. N. Nielson Construction Company, D.C., 30 F.Supp. 77, 79, the court said: "Such competition between labor unions is lawful, and the acts pleaded in furtherance thereof, even to the extent of threatening strikes in furtherance of such lawful object, are lawful and proper."

The test of a violation of the Sherman Act is not that a demand or a strike are unreasonable, but that the restraint upon interstate commerce is unreasonable. Standard Oil Company v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734; United Leather Workers v. Herkert & Meisel Trunk Co., 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566; Levering & Garrigues Company v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062.

In the instant case no acts are alleged to have been performed which would constitute restraint of trade in commercial competition in the marketing of truck-mixers. In Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 851, 79 L.Ed. 1570, 97 A.L.R. 947, the Supreme Court said: "The distinction between direct and indirect effects of intrastate transations upon interstate commerce must be recognized as a fundamental one." Here there is no restraint charged which would be calculated to restrict production of truck-mixers or in any way control the market. There is no restraint of commercial competition such as would substantially affect market prices; no agreements to fix prices, divide marketing territories, apportion customers, restrict production, or any like practices which would tend to raise prices, or take from buyers the advantages accruing from free competition in the market. The only charge is that by reason of strikes, or threats of strikes, the contractors in the Chicago area, who were the employers of defendants, were notified that they would not be allowed to use the truck-mixers unless they would agree to employ the same number of men as would be employed on the "other type" of mixer.

The case of United States v. William L. Hutcheson et al., 32 F.Supp. 600, 602, recently decided by the District Court for the Eastern Division of the Eastern District of Missouri, involved a dispute between the Carpenters' Union and the Machinists' Union over certain construction work which Anheuser-Busch, Inc., sought to have done. The machinists had entered into a contract to do the work, and the carpenters claimed jurisdiction. The Government charged that the conduct of the carpenters was unreasonable and that they were guilty of a conspiracy to restrain interstate commerce under the Sherman Act. The court there said:

"In order to charge the defendants with the commission of a crime under the Sherman Act, the indictment must not only allege sufficient facts to show a conspiracy to cause a direct restraint upon interstate commerce, as distinguished from a remote or incidental restraint * * *, but must also show that defendants' activities were unlawful, outside the scope of the legitimate objects and means that may be sought and employed by labor unions under the sanction of the Clayton Act. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196.

* * * * * * * *

"The real purpose of the defendants, as disclosed by the indictment, was not to restrain commerce, but to prevail in a local labor controversy. The Congress has not

declared that a dispute of the nature alleged is unlawful. By the indictment it is sought to punish the defendants for what is conceived to be an unwarranted interference with a local industry under the pretense that by the dispute interstate commerce was restrained."

In the case of Levering & Garrigues Company v. Morrin, supra, a suit was brought to restrain a Union from conspiring to compel petitioners to employ only members of the labor union in their work of fabricating and erecting structural iron and steel, and from boycotting petitioners. Jurisdiction was based on violation of the Sherman Act. It appeared that petitioners had large contracts for the construction of work in New York City; that respondents were labor organizations; that respondents had called a strike of petitioners' union employees, conducted boycotts and undertaken other injurious interferences. All steel was brought in from other states. The petition alleged that the purpose and intent of respondents was to prevent the use of said steel, with the consequent effect of destroying petitioners' interstate commerce in steel. The Supreme Court there said [289 U.S. 103, 53 S.Ct. 551, 77 L.Ed. 1062]: "Accepting the allegations of the bill at their full value, it results that the sole aim of the conspiracy was to halt or suppress local building operations as a means of compelling the employment of union labor, not for the purpose of affecting the sale or transit of materials in interstate commerce. Use of the materials was purely a local matter, and the suppression thereof the result of the pursuit of a purely local aim. Restraint of interstate commerce was not an object of the conspiracy. Prevention of the local use was in no sense a means adopted to effect such a restraint. It is this exclusively local aim, and not the fortuitous and incidental effect upon interstate commerce, which gives character to the consiracy. [Citing cases.] If thereby the shipment of steel in interstate commerce was curtailed, that result was incidental, indirect, and remote, and, therefore, not within the anti-trust acts, as this court, prior to the filing of the present bill, had already held." United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; United Leather Workers v. Herkert & Meisel Trunk Co. 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566.

Again, in the case of United States v. William L. Hutcheson et al., supra, the court said:

"Whatever rule may be adopted in the various states, labor unions engaged in jurisdictional strikes are immune from suit in the federal courts, so long as lawful means are employed, under the provisions of the Norris-LaGuardia Act of 1932, 29 U.S.C.A. § 101 et seq., enlarging the scope of section 20 of the Clayton Act, 29 U.S.C.A. § 52, New Negro Alliance v. Sanitary Grocery Company, 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012; Lauf v. E. G. Schinner [Grocery] Company, 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872; Blankenship v. Kurfman, 7 Cir., 1938, 96 F.2d 450; Terrio v. S. N. Nielsen Construction Co., D.C., La., 1939, 30 F.Supp. 77.

"That the jurisdictional strike in the present case grows out of a 'labor dispute' within the meaning of the Norris-LaGuardia Act, is shown by Section 13 of the Act (29 U.S.C.A. § 113). In New Negro Alliance v. Sanitary Grocery Company, supra, the Act was held to cover a dispute between an organization interested in procuring employment for members of its race, and an employer. As in the case under consideration, defendants' attempt was to require one class of persons to be employed in place of the class then employed. The Supreme Court found that the purpose of the Norris-LaGuardia Act is to legalize and sanction the use of peaceful persuasion in 'labor disputes' within the terms of the Act, 303 U.S. loc.cit. 562, 58 S.Ct. loc.cit. 707, 82 L.Ed. 1012:

" 'The legislative history of the act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that act (referring to the Duplex case, supra, among others). It was intended that peaceful and orderly dissemination of information by those defined as persons interested in a labor dispute concerning "terms and conditions of employment" in an industry or a plant or a place of business should be lawful; that, short of fraud, breach of the peace, violence, or conduct otherwise unlawful, those having a direct or indirect interest in such terms and conditions of employment should be at liberty to advertise and disseminate facts and information with respect to terms and conditions of employment, and peace-

198

fully to persuade others to concur in their views respecting an employer's practices.'"

Sections 6 and 20 of the Clayton Act were under consideration by the Supreme Court in the cases of Duplex Printing Press Co. v. Deering, supra, and Bedford Cut Stone Company v. Journeyman Stone Cutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791, and in both cases the court held that secondary boycotts (the means used by the Unions to accomplish their demands) were unlawful, and therefore sections 6 and 20 of the Clayton Act did not exempt them from liability under Section One of the Sherman Act. Section 6 was held to protect only the existence of labor organizations and the carrying out of their legitimate objects by lawful means. Section 20 was restricted in application to disputes involving employers, employees, and persons seeking employment, and immunity was not extended to labor organizations or individuals not parties to the dispute.

By the passage of the Norris-LaGuardia Act such restriction in the scope of the Clayton Act is no longer in force. New Negro Alliance v. Sanitary Grocery Company, supra. Protection is now extended to persons and organizations not immediate parties to the dispute.

In the case of United States v. Gold, 115 F.2d 236, 237, Judge Hand, speaking for the Circuit Court of Appeals for the Second Circuit, said: "The case was tried before the decision of the Supreme Court in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, before which it had been quite commonly supposed that the Sherman Act covered, not only concerted action intended to control prices or supply, or resulting in such control, but generally all action which so far affected interstate commerce as to be within the constitutional power of Congress at all; that is, that Congress in the Sherman Act had meant to exercise its power as broadly as possible. This view the court repudiated in the Apex case. Its reasoning was that the act had been passed only to implement the common law as to restraints of trade; and that, although it imposed its own liabilities, civil and criminal, besides providing remedies for their breach, nevertheless it took the common law as its model, creating federal rights and duties fashioned after existing precedents. So much the court had often said before, and the new contribution was that,

turning to those precedents, it now held that the only restraints forbidden were those which limited competition in 'business and commercial transactions,' and which 'tended to restrict production, raise prices or otherwise control' the market to the detriment of purchasers or consumers of goods and services.' * * * Mere restraints upon transportation of goods across state lines were therefore not enough; they must be in execution of a plan to restrict market competition, or that must be their necessary result."

Both sides cite and quote from the late case of Apex Hosiery Company v. Leader, 310 U.S. 469, 60 S.Ct. 982, 992, 84 L.Ed. 1311, 128 A.L.R. 1044, where the Supreme Court reviews the history of the Sherman Act, and exhaustively analyzes, distinguishes and reconciles its previous decisions in anti trust cases, holding that the restraints forbidden by the Sherman Act are those which limit competition "in business and commercial transactions" and which tend to "restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers."

In the Apex case, supra, the record disclosed a lawless invasion of the Hosiery Company's plant and destruction of its property by force and violence of the most wanton character. There was also direct and intentional restriction of shipments by the Company of approximately $800,000 worth of completed goods which was all ready to be shipped in interstate commerce. In disposing of this case the Supreme Court said:

"At the outset, and before considering the more substantial issues which we regard as decisive of this cause, it is desirable to remove from the field of controversy certain questions which have been much argued here and below, but which we think, in the circumstances of the present case, are irrelevant to decision. We find abundant support for petitioner's contention that the effect of the sit down strike was to restrict substantially the interstate transportation of its manufactured product, so as to bring the acts of respondents by which the restriction was effected within the reach of the commerce power if Congress has seen fit to exercise it. Cessation of petitioner's manufacturing operations, which respondents compelled, indubitably meant the cessation of shipments interstate. The effect upon the commerce resulted naturally and inevitably from the

cause. The occupancy of petitioner's factory by the strikers prevented the shipment of the substantial amount of merchandise on hand when the strike was called. In point of the immediacy of the effect of the strikers' acts upon the interstate transportation involved and of its volume, the case does not differ from many others in which we have sustained the Congressional exercise of the commerce power. The national power to regulate commerce is not restricted to that which is nationwide in its scope. Here the strikers' activities were as closely related to interstate commerce and affected it as substantially as numerous other activities not in themselves interstate commerce which have nevertheless been held to be subject to federal statutes enacted in the exercise of the commerce power. * * *

"And in the application of the Sherman Act, as we have recently had occasion to point out, it is the nature of the restraint and its effect on interstate commerce and not the amount of the commerce which are the tests of violation. See United States v. Socony Vacuum Oil Co. 310 U.S. 150 [224], 60 S.Ct. 811, 84 L.Ed. [1129] note 59. * * *

"But the Sherman Act admittedly does not condemn all combinations and conspiracies which interrupt interstate transportation. [Citing cases.] In re Debs, 158 U.S. 564, 600, 15 S.Ct. 900, 912, 39 L.Ed. 1092, this Court declined to consider whether the stoppage of trains on an interstate railroad resulting from a strike, was a violation of the Sherman Act—a question which it has not since been called on to decide.

"It is not seriously contended here that a conspiracy to derail and rob an interstate train, even though it were laden with 100,-000 dozen pairs of stockings, necessarily would involve a violation of the Sherman Act. This Court has never applied the Act to laborers or to others as a means of policing interstate transportation, and so the question to which we must address ourselves is whether a conspiracy of strikers in a labor dispute to stop the operation of the employer's factory in order to enforce their demands against the employer is the kind of restraint of trade or commerce at which the Act is aimed, even though a natural and probable consequence of their acts and the only effect on trade or commerce was to prevent substantial shipments interstate by the employer.

"A point strongly urged in behalf of respondents in brief and argument before us is that Congress intended to exclude labor organizations and their activities wholly from the operation of the Sherman Act. To this the short answer must be made that for the thirty-two years which have elapsed since the decision of Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815, this Court, in its efforts to determine the true meaning and application of the Sherman Act has repeatedly held that the words of the act, 'Every contract, combination * * * or conspiracy, in restraint of trade or commerce' do embrace to some extent and in some circumstances labor unions and their activities;[1] and that during that period Congress, although often asked to do so, has passed no act purporting to exclude labor unions wholly from the operation of the Act. On the contrary Congress has repeatedly enacted laws restricting or purporting to curtail the application of the Act to labor organizations and their activities, thus recognizing that to some extent not defined, they remain subject to it. * * *

"In considering whether union activities like the present may fairly be deemed to be embraced within this phrase, three circumstances relating to the history and application of the Act which are of striking significance must first be taken into account. The legislative history of the Sherman Act as well as the decisions of this Court interpreting it, show that it was not aimed at policing interstate transportation or movements of goods and property. The legislative history and the voluminous literature which was generated in the course of the enactment and during fifty years of

[1] Loewe v. Lawlor, 208 U.S. 274, 28 S. Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874; Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L. Ed. 403; Bedford Cut Stone Co. v. Journeyman Stone Cutters, 274 U.S. 37, 47 S. Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804.

litigation of the Sherman Act give no hint that such was its purpose.

"They do not suggest that, in general, state laws or law enforcement machinery were inadequate to prevent local obstructions or interferences with interstate transportation, or presented any problem requiring the interposition of federal authority. In 1890 when the Sherman Act was adopted there were only a few federal statutes imposing penalties for obstructing or misusing interstate transportation. With an expanding commerce, many others have since been enacted safeguarding transportation in interstate commerce as the need was seen, including statutes declaring conspiracies to interfere or actual interference with interstate commerce by violence or threats of violence to be felonies. It was another and quite a different evil at which the Sherman Act was aimed. It was enacted in the era of 'trusts' and of 'combinations' of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern. The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury.

"For that reason the phrase 'restraint of trade' which, as will presently appear, had a well-understood meaning at common law, was made the means of defining the activities prohibited. The addition of the words 'or commerce among the several States' was not an additional kind of restraint to be prohibited by the Sherman Act but was the means used to relate the prohibited restraint of trade to interstate commerce for constitutional purposes. * * *

"A second significant circumstance is that this Court has never applied the Sherman Act in any case, whether or not involving labor organizations or activities unless the Court was of opinion that there was some form of restraint upon commercial competition in the marketing of goods or services. And finally this Court has refused to apply the Sherman Act in cases like the present in which local strikes conducted by illegal means in a production industry prevented interstate shipment of substantial amounts of the product but in which it was not shown that the restrictions on shipments had operated to restrain commercial competition in some substantial way. * * *

"Since the enactment of the declaration in § 6 of the Clayton Act that 'the labor of a human being is not a commodity or article of commerce. * * * nor shall such (labor) organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws', it would seem plain that restraints on the sale of the employee's services to the employer, * * * are not in themselves combinations or conspiracies in restraint of trade or commerce under the Sherman Act. * * *

"If, without such effects on the market, we were to hold that a local factory strike, stopping production in shipment of its product interstate, violates the Sherman law, practically every strike in modern industry would be brought within the jurisdiction of the federal courts, under the Sherman Act, to remedy local law violations. The Act was plainly not intended to reach such a result, its language does not require it, and the course of our decisions precludes it. The maintenance in our federal system of a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs is of far-reaching importance. An intention to disturb the balance is not lightly to be imputed to Congress. The Sherman Act is concerned with the character of the prohibited restraints and with their effect on interstate commerce."

The Government contends that nothing in the opinion in the Apex case can be construed to indicate that the cases of Loewe v. Lawlor, supra, Duplex Printing Press Co. v. Deering, supra, and the Bedford Stone case, supra, are no longer good authority. This is answered by Judge Hand, in the Gold case, supra, where he says: "The accused therefore restrained the 'marketing' of an interstate service, as they did not restrain the 'marketing' of the skins themselves. It is true that their purpose was not to control prices or supply; they were indifferent to these except as a sanction for bending the three obdurate firms to their will. But purpose is never an excuse in these cases; only the intent of the accused, or the necessary result of his conduct, counts, and it would appear

enough that here they intended to stop all 'marketing' of service. So far, therefore, the case at bar is on all fours with a number of earlier decisions, except that they dealt with goods instead of services. Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; Bedford Cut Stone Co. v. Journeyman Stone Cutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791. Nevertheless there was one element lacking which was present in the decisions just cited, and which the court thought crucial in the Apex case. Although the accused at bar intended to stop the marketing of the services of the three recalcitrant firms, the operations of those firms were not shown to have been upon a large enough scale to make their cessation affect market conditions in New York. That that is now an essential element appears from the following extract out of the opinion in the Apex case: 'It will be observed that in each of these cases where the Act was held applicable to labor unions, the activities affecting interstate commerce were directed at control of the market and were so widespread as substantially to affect it.' * * * That can only mean that unless the strike is so 'widespread' as to affect prices or supply, it is not 'restraint of trade,' even though it is directed against the 'marketing' of goods or services. It is certainly not for us to say how far the four decisions cited lend themselves to such a distinction; the court itself was not unanimous upon the point. We have only to follow the decision made."

In Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 127, 85 L.Ed. ——, a case appealed from this court, in which the Supreme Court handed down its opinion on November 18th, 1940, involving an injunction in a civil case, the court said:

"No specific language of the Norris-LaGuardia Act is pointed to in support of the theory that the act was to be inapplicable where injunctions are sought against labor unions charged with violating the Sherman Act in the course of labor disputes. On the contrary, section 1 of the Norris-LaGuardia Act provides that 'No court of the United States * * * shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this Act (chapter).' This unequivocal jurisdictional limitation is reiterated in other sections of the act. The Norris-LaGuardia Act—considered as a whole and in its various parts—was intended drastically to curtail the equity jurisdiction of federal courts in the field of labor disputes. And this court has said that 'the legislative history of the act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that act. [New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 562, 58 S.Ct. 703, 707, 82 L.Ed. 1012]. * * * The Norris-LaGuardia Act passed in 1932, is the culmination of a bitter political, social and economic controversy extending over half a century. Hostility to 'government by injunction' had become the rallying slogan of many and varied groups. Indeed, as early as 1914 Congress had responded to a widespread public demand that the Sherman Act be amended, and had passed the Clayton Act, * * * itself designed to limit the jurisdiction of federal courts to issue injunctions in cases involving labor disputes. But the proponents of the Norris-LaGuardia Act felt that the jurisdictional limitations of the Clayton Act had been largely nullified by judicial decision. Thus, the Senate Judiciary Committee, reporting the Norris-LaGuardia Act, said: 'That there have been abuses of judicial power in granting injunctions in labor disputes is hardly open to discussion. The use of the injunction in such disputes has been growing by leaps and bounds. * * * For example, approximately 300 were issued in connection with the railway shopmen's strike of 1922, * * *.' And on the same subject the House Judiciary Committee said: 'These are the same character of acts which Congress in section 20 of the Clayton Act of October 15, 1914, 29 U.S.C.A. § 52, sought to restrict from the operation of injunctions, but because of the interpretations placed by the courts on this section of the Clayton Act, the restrictions as contained therein have become more or less valueless to labor, and this section is intended by more specific language to overcome the qualifying effects

of the decisions of the courts in this respect.' As an example of the judicial interpretation of the Clayton Act which the Committee said was 'responsible in part for this agitation for further legislation,' the Committee referred to the cases of Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196, American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360, and Bedford Cut Stone Co. v. Journeyman Stone Cutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791. In these cases, the jurisdiction of the courts to grant injunctions had been upheld upon allegations and findings that the Sherman Anti-Trust Act had been violated.

"Whether or not one agrees with the committees that the cited cases constituted an unduly restricted interpretation of the Clayton Act, one must agree that the committees and the Congress made abundantly clear their intention that what they regarded as the misinterpretation of the Clayton Act should not be repeated in the construction of the Norris-LaGuardia Act. For us to hold, in the face of this legislation, that the federal courts have jurisdiction to grant injunctions in cases growing out of labor disputes, merely because alleged violations of the Sherman Act are involved, would run counter to the plain mandate of the act and would reverse the declared purpose of Congress."

If the Milk Drivers'. Union here was immune from prosecution in a civil suit, because of the provisions of the Norris-LaGuardia Act, surely it would likewise be immune from prosecution in a criminal suit. I agree with the holding of Judge Davis in the case of United States v. Hutcheson et al., supra, where he said: "This is alleged to be a criminal case. The indictment should set forth facts which if proved would constitute a crime. That this indictment does not do. The tendency of legislation has been to countenance conduct such as that set out in the indictment, by providing that it does not give rise to even a civil action. This policy of the law inheres in all the relations between employer and employee. That which does not amount to a civil wrong can hardly be characterized as criminal."

Inasmuch as this disposes of the indictment, it is unnecessary to consider the other grounds set up in the demurrers.

The separate demurrers will be sustained.