**LUMBER PRODUCTS ASS'N, Inc., et al.
v. UNITED STATES.**

No. 10011.

Circuit Court of Appeals, Ninth Circuit.

Aug. 23, 1944.

Rehearing Denied Oct. 14, 1944.

Maurice E. Harrison, Moses Lasky, Brobeck, Phleger & Harrison and James M. Thomas, all of San Francisco, Cal., for Lumber Products Ass'n group of appellants.

Joseph O. Carson, II, of Indianapolis, Ind., Harry N. Routzohn, of Dayton, Ohio, and Hugh K. McKevitt and Jack M. Howard, both of San Francisco, Cal., for certain Labor Union appellants.

Joseph O. Carson, of Indianapolis, Ind., Charles H. Tuttle and Thomas E. Kerwin, both of New York City, and Hugh K. McKevitt, of San Francisco, Cal., for appellant United Brotherhood of Carpenters and Joiners of America.

Clarence E. Todd, of San Francisco, Cal., for appellant Alameda County Building & Construction Trades Council.

Morgan J. Doyle, of San Francisco, Cal., for appellants Boorman Lumber Co. et al.

Charles S. Burdell, Sp. Asst. to Atty. Gen., of Seattle, Wash., and Joseph L. Alioto and George W. Hippeli, both of San Francisco, Cal., John S. Harlow, of Seattle, Wash., and James McI. Henderson, of San Francisco, Cal. (Tom C. Clark, Asst. Atty. Gen., and Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., of counsel), for appellee.

Before GARRECHT, DENMAN, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a judgment of the district court sentencing appellants for violation of Section 1 of the Sherman

Anti-Trust Act,[1] on finding the several appellants guilty or acting on pleas of nolo contendere. They were among a large group indicted on two counts for combining and conspiring to violate that Act. The second count was dismissed upon motion of the government.

For convenience in describing the parties to the alleged conspiracy, one group of the present appellants will be designated as the "Union Group" and the remaining appellants as the "Manufacturer Group." The former group is composed of the United Brotherhood of Carpenters and Joiners of America, an international union affiliated with the A. F. of L., two area Trade Councils, two local unions, affiliated with the above international, and several officers and members of these associations. The latter group is composed of Trade associations, corporations and individuals.

All of the appellants were engaged in or otherwise associated with the manufacture, distribution, sale or installation of mill work and patterned lumber in the San Francisco Bay Area.

The facts alleged to constitute the charge of the indictment show that prior to 1936 at least 80% of the mill work and patterned lumber used in the San Francisco area was produced in states other than California. The principal area of production was in Washington and Oregon. The processing of lumber products in the latter two states was with the most developed equipment and on a large scale mass basis in which, in some instances, raw timber was converted into finished lumber in a single continuous operation. This method of production was in marked contrast to the apparently more costly, small plant operations of the Bay area manufacturers, in which the skilled labor of craftsmen was used. The labor used in the Washington and Oregon production, though organized, was on a lower wage scale than that of the Bay area mill workers at the time the alleged conspiracy was formed, though it does not appear that the annual wage of the out-of-state labor was lower or their cost of living as high.

The Manufacturer Group involved here produced substantially all the mill work and patterned lumber made in the area. All of the craftsmen skilled in the production or installation of these products had to be members of a local of the Union Group before they could work for the Manufacturers. It was alleged that under these circumstances the combined power of these two groups was great. It is apparent that such monopoly power well could impose a greatly increased cost to the smaller home builder and others in the great building activity of such a state as California, with its extraordinary immigration of the past two decades.

It was further alleged that in 1936 the Union Group demanded an increase in wages. This demand was acceded to by the Manufacturer Group in exchange for an agreement by the unions to prevent the sale and shipment to the Bay area of products manufactured outside of California. This agreement was reduced to a written contract between the parties in which they agreed that "* * * no material will be purchased from, and no work will be done on any material or article that has had any operation performed on same by Saw Mills, Mills or Cabinet Shops, or other distributors that do not conform to the rates of wage and working conditions of this agreement." This exclusionary clause was alleged to be subject to certain named exceptions.

The Manufacturer Group circulated among the trade price lists and market reports which effected artificial and non-competitive prices for mill work and patterned lumber. These were enforced by the Union Group by picketing, work stoppages and other means, preventing the use of materials purchased in violation of the terms of the contract.

On the basis of the alleged facts and conduct it was finally charged that the object and effect of the combination was to stop the sale of mill work and patterned lumber by manufacturers in other states in the San Francisco area and to prevent lumber yards and jobbers in that area from purchasing such out-of-state products and thereby permit the raising and fixing of prices in such products. It was further charged that the conspiracy had succeeded in its object and that prices of mill work and patterned lumber had been arbitrarily and unreasonably increased.

All of the defendants demurred to the indictment. This was overruled by the trial court. Thereafter all the parties here making up the Manufacturers Group withdrew their pleas of not guilty and entered

---

[1] 15 U.S.C. § 1, 15 U.S.C.A. § 1.

pleas of nolo contendere.[2] The parties falling in the Union Group maintained their plea of not guilty, were tried and found guilty by verdict of a jury.

The first issue common to all of the appellants is the sufficiency of the indictment. It is contended that the trial court erred in refusing to sustain the demurrers which were based on the ground that the allegations of the indictment failed to state a crime under the Sherman Act in that the agreement between the parties merely embodied legitimate objectives of labor, successfully obtained through the process of collective bargaining in termination of a labor dispute. Appellants urge here that the doctrines of the Supreme Court decisions in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, and United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, are controlling.

Appellants argue that nothing unlawful is charged, for it is well established that labor may lawfully refuse to work on any product it sees fit and from this freedom it follows that labor may make the intention of such a refusal the terms of a contract.

The government argues that the allegations of the indictment cannot be so narrowly construed. They must be viewed in the light of all the facts charged, and, though such a provision in a contract may not be invalid on its face, the factual context in which it will work, its alleged purpose and ultimate effect cannot be ignored in determining its actual validity. Considering all these factors the government contends that the agreement was for the express purpose of committing the offense of violating the Sherman Act; that the gains in wages to the labor conspirators and in the profits to the co-conspiring manufacturers from their monopoly grip on the home builder and other consumers of such lumber products in the San Francisco area were not mere fortuitous and incidental results of the agreement; and that Congress in enacting the Norris-LaGuardia Act did not intend that labor should be free so purposefully to conspire with its employers to exact a tribute from the consumers of their products.

■ We agree with the government that the charges of the indictment and the factual allegations made in their support are not of a restraint upon commerce merely incident to the ordinary disruption of the production of an employer, arising out of a protracted labor dispute and necessary to the achieving of a legitimate objective of organized labor. Rather there is here alleged a combination for a direct restraint upon commerce with an objective of destroying the competition of that commerce and permitting the fixing and maintenance of the local area prices at an arbitrary, artificial and non-competitive level. It is such intended restraints for such an objective at which the sanctions of the Sherman Act are directed.[3]

Nor are the appellants aided by the statement in the Apex case that the restrictive effect upon the power of an employer to compete in commerce by the elimination of price competition based on differences in labor standards, resulting from the successful consummation of a wage agreement by a union, is not within the Sherman Act. Not only was the price competition of mill work and patterned lumber products of Washington and Oregon attributed in part to more efficient, technically improved, large scale methods, but here the elimination of competition was not a result merely incidentally flowing from the achieved objective of increased wages but the means of obtaining it. Also there is not here the protection or preservation of a previously existing interest lending reasonableness to a restraint, but rather the bold pursuit of restraint for the direct mutual advantage of the parties, to be gained by the monopoly price tribute from the consumer.

■ Because organized labor may lawfully strike, picket or boycott in support of its demands for higher wages which an employer may or may not be able to pay, it does not follow that labor and the employer may agree to use these weapons to destroy the competition of interstate commerce and give the employer a monopoly price raising contract and thereafter "split the take." Such conduct is not within the scope of the immunity described in the Apex case.

Likewise the monopoly purposes and objective of the agreement between the labor unions and the manufacturers distinguishes the conduct charged here from that held under the provisions of the Norris-La-

---

[2] Cf. Edwards v. United States, 312 U.S. 473, 61 S.Ct. 669, 85 L.Ed. 957.

[3] See 28 Cal.L.Rev. (1940) 747, 759.

Guardia Act to be immune from prosecution in United States v. Hutcheson, supra. In that case the dispute was between two unions and the effect on interstate commerce was an incident to and not the objective of the defendants' conduct. That case clearly indicates that, as shown in the Apex case, there is an area of conduct of combined labor and capital violative of the Sherman Act which is not immunized from prosecution under the Norris-LaGuardia Act. This appears in the statement of Mr. Justice Frankfurter's opinion, 312 U.S. at page 242, 61 S.Ct. at page 466, 85 L.Ed. 788, that "So long as a union acts in its self-interest and does not combine with non-labor groups,[3] [footnote [4] below] the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means."

In United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403, so cited in the Hutcheson case, the Supreme Court held violative of the Sherman Act a conspiracy of manufacturers of mill work, building contractors, and union carpenters, to check competition from non-union-made mill work coming from other states, to accomplish which the manufacturers and contractors were to employ only union carpenters, who would refuse to install the non-union mill work. This combination of labor "with non-labor groups" so held to violate the Sherman Act even lacked the element here charged of the enforcement of the employers' artificial and non-competitive price list, circulated to the trade and forced upon the consumer by the picketing and work-stoppages of the unions. There the conspirators, the Supreme Court states (272 U.S. at page 552, 47 S.Ct. at page 170, 71 L.Ed. 403), "wished to eliminate the competition of Wisconsin and other nonunion mills, which were paying lower wages and consequently could undersell them. Obviously it would tend to bring about the desired result if a general combination could be secured under which the manufacturers and contractors would employ only union carpenters with the understanding that the latter would refuse to install non-union-made mill work. And we think there is evidence reasonably tending to show that such a combination was brought about, and that, as intended by all the parties, the so-called outside competition was cut down and thereby interstate commerce directly and materially impeded. The local manufacturers, relieved from the competition that came through interstate commerce, increased their output and profits; they gave special discounts to local contractors; more union carpenters secured employment in Chicago, and their wages were increased. These were the incentives which brought about the combination. The nonunion mills outside the city found their Chicago market greatly circumscribed or destroyed; the price of building was increased, and, as usual under such circumstances, the public paid excessive prices."

In the four cases[5] succeeding United States v. Hutcheson, in which the Supreme Court sustained, without opinion, the dismissals of the indictments, there is a charge of a purpose to restrain interstate commerce, but in no one of them does it appear that the labor dispute is ended and emerging from it are monopolies, previously purposed and intended, in which both labor and employer successfully divide the gain from the price raising of the combination. In three of them the combination is between labor groups alone. In one, United States v. International Hod Carriers' and Common Laborers' District Council of Chicago and Vicinity, 313 U.S. 539, 61 S.Ct. 839, 85 L. Ed. 1508, the Supreme Court sustained the district court (United States v. Carrozzo, 37 F.Supp. 191, 193, 196) which had dismissed the indictment in which it was charged that the combined labor unions "by means of strikes and threats of strikes . . . force paving contractors in the Chicago area to enter into working agreements with the defendant Council requiring paving contractors using truck mixers in the Chicago area to employ the same number of men which they would employ if truck mixers were not used; * * *"

Here is no allegation of a combination of

---

[3] See 28 Cal.L.Rev.(1940) 747, 759.

[4] "Cf. United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403, involving a conspiracy of mill work manufacturers, building contractors and union carpenters.

[5] United States v. Building & Construction Trades Council, 313 U.S. 539, 61 S. Ct. 839, 85 L.Ed. 1508; United States v. Carrozzo, D.C., 37 F.Supp. 191; United States v. International Hod Carriers', etc., Council, 313 U.S. 539, 61 S.Ct. 839, 85 L. Ed. 1508; United States v. American Federation of Musicians, D.C., 47 F.Supp. 304; Id., 318 U.S. 741, 63 S.Ct. 665, 87 L. Ed. 1120.

unions and employers to restrain interstate commerce such as is referred to in the opinion in the Hutcheson case. If there be an impediment to the interstate commerce in truck mixers of concrete by so forcing the employers to the extra expense of mixing concrete by hand labor, it is, as stated in the opinion of the district court "only indirect and incidental," and as that opinion also states "In the instant case no acts are alleged to have been performed which would constitute restraint of trade in commercial competition in the marketing of truck-mixers." 37 F.Supp. 196. Furthermore, the coercion of the employers is against the employers' interest and solely for the interest of the union members. The situation is strikingly different from one where the agreement between employers and unions for the exclusion of the articles from outside the state is purposed at once to raise prices by monopoly pricing and create an increased wage by such pricing.

Here the Manufacturer Group and the Union Group are no longer "participating or interested in a labor dispute" as that term is used in § 5 of the Norris-LaGuardia Act.[6] The dispute is past. The labor and non-labor groups are combined. The acts described in § 4 of that Act[7] and section 20 of the Clayton Act,[8] some of which are charged in the indictment here to have been committed by the now non-disputant unions and their members and their manufacturing employers are not to secure any legitimate advance of the laborer's interest. They are squeezing implements to extort what, in effect, is a capital levy on the home builder and other consumers. Their lack of organ-

[6] "No court of the United States shall have jurisdiction to issue a restraining order or temporary or permanent injunction upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in section 4 of this title." 29 U.S.C. § 105, 29 U.S.C.A. § 105.

[7] "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment; * * *

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence; * * *

"(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 3 of this title." 29 U.S. C. § 104, 29 U.S.C.A. § 104.

[8] 38 Stat. 738, 29 U.S.C. § 52, 29 U.S.C. A. § 52. "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

ization makes them helpless to defend themselves against the monopolistic conspirators.

We hold that Congress in enacting the Norris-LaGuardia Act and the Clayton Act did not give immunity to the "wrongness" and the "illicit" of this character of combination of labor with non-labor groups. The district court committed no error in overruling the demurrers and in refusing to dismiss the indictment.

■ It is contended that the trial court erred in denying the defendants' motion for a directed verdict in that there was insufficient evidence to support the charges of the indictment. But in reviewing the record we find evidence of agreements between the two groups and conduct on the part of each directed at the elimination of competition from the northern products by the price control and other acts from which a jury well could find a concert of action and purpose to unlawfully restrain interstate commerce. Therefore, the trial court did not err in submitting the case to the jury.

Appellant United Brotherhood of Carpenters and Joiners of America does not argue here the question of the sufficiency of the evidence to support the charge that some form of agreements existed between the local labor groups and the employer group or that they may have had as their objectives the suppression of commerce. But it does raise, separately, the issue of whether there was evidence of its knowing of or being a party to the found combination or conspiracy.

■ There was evidence showing knowledge and participancy by the president, vice-president and field representative of the international in the negotiation of working agreements in the Bay area between the local organizations and the mill operators. There was also evidence of approval of those agreements by those officers acting in their capacity of final arbiters of problems or differences which might arise between locals. We cannot say there was nothing upon which the jury could find this appellant, through its authorized agents in pursuit of its accepted policy, was a party to the combination.

■ The Alameda County Building and Construction Trades Council attacks the sufficiency of the evidence as to it in the same manner. We find ample evidence of the Council aiding in the enforcement of an agreement to exclude certain types of lumber and determining whether certain dealers should be placed on the unfair list for violating the agreements from which the jury could find participation in the conspiracy. The trial court did not err in refusing an instructed verdict for this appellant.

■ Error is claimed by two of the defendants, Christian A. Wilder and Charles Gustafson, both of the Manufacturer Group, in the trial court's overruling of their plea to its jurisdiction and in rendering judgment and imposing sentence on them. The grounds urged are that they, as individuals, had not been indicted by a grand jury. Rather, it is contended, only the firms of which they are partners had been indicted.

Paragraph 8 of the first count of the indictment states, in part, "The following named individuals, partnerships and corporations * * * are hereby indicted and made defendants herein * * * The legal status and principal place of business or residence of the owners are listed below." There then follows a page set out in five columns. In the first of these are listed eight names of business houses. The second column lists "Legal Status," i.e., corporation, partnership, individuals. The third column lists "Names of partners or individuals," and included among the names under the heading are those of Wilder and Gustafson.

It requires no strained construction to find the obvious. Clearly those two defendants were included among the "following named individuals" who were indicted. The trial court did not err in its ruling on their pleas and motions.

■ Appellants of Local No. 42 and Local No. 550 of the United Brotherhood of Carpenters and Joiners assert that the trial court erred in sustaining the government's demurrer to their pleas founded on an alleged immunity said to arise out of the forced production of subpoena duces tecum of the records and documents of these unions by the grand jury. This contention has been foreclosed by the recent decision of the Supreme Court in United States v. White, 64 S.Ct. 1248.

■ Like error is claimed by appellants Ryan, O'Leary and Helbing, who were officers or business agents of the Locals or Councils indicted. Pursuant to subpoenas duces tecum addressed to their organizations, these men appeared before the grand

jury and, under protest, produced the desired organizational records and documents. It is clear from the decision in the White case that these defendants could not claim a personal immunity arising out of the production of documents held in their custody in an official capacity.

However, in addition to their producing union books and papers, each was forced to testify before the grand jury. The question is then raised as to whether their testimony concerned in a substantial way their own connections with the transactions for which they were subsequently found guilty as charged. Heike v. United States, 227 U.S. 131, 144, 33 S.Ct. 226, 57 L.Ed. 450. The trial court found no such substantiality and concluded they were not immune from prosecution under 15 U.S.C.A. § 32.

■ The transcript of their testimony given before the grand jury is included within the record now before us. Ryan v. United States, 9 Cir., 128 F.2d 551, 552. It shows that each identified the organizational records produced; that each was an officer or agent of his respective union, and that each outlined the organizational structure and relationships between the several unions. None of such testimony is within the ' area of immunity. United States v. Greater New York Live Poultry C. of C., D.C.N.Y., 34 F.2d 967, certiorari denied, 283 U.S. 837, 51 S.Ct. 486, 75 L. Ed. 1448.

The grand jury transcript further shows that Ryan identified as being his own a signature on a contract dated September 21, 1926. He was then asked, "Do you recall the circumstances under which that contract was negotiated * * *?" and answered by describing how conference committees chosen by the parties, the unions and employers, negotiated such agreements. The next question was, "Now, in connection with the contract I have just handed you, * * * did you personally sit in at these negotiations?" to which he answered "Yes."

■ True, that identification by an officer of his signature on a contract entered into by his organization may not have sufficient relationship to the investigated transaction to warrant granting immunity. Cf. United States v. Illinois Alcohol Co., 2 Cir., 45 F.2d 145, 149. Certainly the description of the methods of negotiations in themselves are not within the protected area. Where an individual is required to answer whether he participated in the negotiations of a contract a clause of which is subsequently set forth in an indictment found against him charging its operation to be one of the means "of effectuating * * * [an] * * * unlawful combination and conspiracy," it cannot be said that his testimony has no substantial bearing on a transaction and its criminality founded on merely some imaginary hypothesis. Ex parte Irvine, C.C., 74 F. 954, 960; Mason v. United States, 244 U.S. 362, 365, 37 S.Ct. 621, 61 L.Ed. 1198; United States v. Molasky, 7 Cir., 118 F.2d 128, 134; Doyle v. Hofstader, 257 N.Y. 244, 177 N.E. 489, 87 A.L.R. 418. Proof of this portion of the contract was treated by the government as one of the vital links in the chain of evidence summing up the existence of a conspiracy to restrain trade, cf. United States v. Murdock, 284 U.S. 141, 150, 52 S.Ct. 63, 76 L.Ed. 210, 82 A.L.R. 1376, and acknowledgment of having participated in its negotiations would "tend" in rather a strong sense to incriminate him. United States v. St. Pierre, 2 Cir., 132 F.2d 837, 838, 147 A.L.R. 240. That the contract on its face may have been lawful, United States v. Weisman, 2 Cir., 111 F.2d 260, 262, or that the defendant signed it in an official capacity cannot be said to destroy his immunity as an individual in all circumstances.

As to appellant O'Leary, in addition to identifying to the grand jury union documents explaining entries in the minute books, describing the labor conditions prevailing during the period of the conspiracy, negotiations over wages, he was asked if he worked in a "Negotiating Committee" made up of union representatives and employer representatives which worked on a stabilization agreement. He answered in the affirmative. Further testimony before the grand jury, warranting him immunity is stated in the footnote.[9]

Regarding the testimony of appellant

[9] O'Leary was further asked: "Now, referring to the minutes of January 13, 1939, I notice that it states, 'Business Agent O'Leary reported checking over the sidings and freight sheds and mills during the week and not finding any hot mill work.' Do you recall the circumstances surrounding your activities as mentioned

Helbing before the grand jury, information of negotiations between the unions and the employers similar in kind to that of O'Leary was given. In addition he was asked if he knew a Mr. Jones of Jones Hardwood Company. He answered, "I have spoken to the gentleman."

"Q. As a matter of fact, you called on him, didn't you, and asked him to put up one of those placards that the Grand Jury has seen here? A. He asked me first— he sent me a letter in reference to certain things and conditions, and I went down to see Mr. Jones.

"Q. And you asked him at that time to put up a placard didn't you? A. Yes, to boost local material.

"Q. Now, do you recall some doors that were coming in for a Ferry Building job down here, from a concern in Wisconsin? A. No, I can't recall that.

"Q. You don't? Don't you recall that Mr. Jones had ordered some doors from this concern in Wisconsin and that he couldn't bring them in here? A. No, he was given concessions—I didn't transact that particular part of it. There were two of us on the job, here, part of the time last year.

"Q. Do you recall Mr. Helbing, that due to the fact that this company in Wisconsin did not have the label, that Mr. Jones obtained certain letters from them stating that they were fully organized A. F. of L. with their local union number on those letters? Do you recall that? A. No, I don't. What I did tell Mr. Jones was this, when he asked me the question in reference to those doors. I said, 'When the time arrives, when you have doors coming in here, why, we will take it up.'"

Among the objects of the conspiracy alleged in the indictment was the exclusion of mill work and patterned lumber manufactured in states other than California. Among the means and methods alleged was "defendants * * * by means of pickets and threats to picket, forced the Jones Hardwood Company of San Francisco to cancel an order for mill work and patterned lumber from the Roddis Lumber and Veneer Company of Marshfield, Wisconsin * * *."

At the trial the government introduced a letter addressed to Helbing's local in which the Jones Hardwood Company inquired whether there were restrictions on certain doors manufactured in Wisconsin. During the course of the government's cross-examination of Helbing he was again interrogated regarding his conversations with Jones.

■ Apart from O'Leary's and Helbing's participation in the negotiations between the unions and the manufacturers, it is clear that the grand jury questions bearing on their own conduct relating to the exclusion of the out-of-state products coming into the area had a very substantial relationship to the transactions found to restrain commerce and a direct tendency to incriminate them if other facts were found. To subpoena a person to appear and testify before a grand jury investigating possible unlawful restraints on interstate commerce and then force him to answer in what manner he kept articles of such commerce from being sold, certainly is to invade the area of incrimination and

---

in this excerpt from the minutes?" Answer "Yes." Then the following questions and answers were put and given.

"Q. Would you state them to the Grand Jury? A. Well, every once in a while somebody will break out with a rash over there that there is a hell of a lot of non-union mill work coming in from the North—.

"Q. That is, from Washington and Oregon? A. Yes, I guess they don't come in from British Columbia, and they want to know what the hell the business agent is doing,—'How are we going to live and work here if that cheap work comes in?' and naturally enough, they want me to go out and check on it.

"Q. When you go out and check, what do you do? A. Go around to all the sidings and look them over, and see if there is any cars setting on them, and see what is in them.

"Q. If you find that there is any so-called 'hot mill work' in any cars on any of these sidings, what do you do then? A. Go to the employer, or the man that is purchasing them and try to get him to use local made mill work. Now, in using the words 'mill work' it has to do with moldings— there was a time when all surfaced material used to bear the label, and the carpenters would not handle it unless it did. At present, why, four-side stuff can come in; we don't bother about it, but if there is moldings comes in we object to it."

raise the immunity granted by 15 U.S.C.A. § 32. The trial court erred in refusing to dismiss the indictment as to these three defendants.

■ Those appellants who pleaded not guilty and were tried excepted to certain instructions such as the following:

"In this case the question is whether the labor union defendants entered into a combination with the non-labor defendants whereby the defendants intended to or did bring about an undue restriction of or interference with interstate commerce in mill work or patterned lumber." "If you find that the employer and labor union defendants entered into an agreement or understanding, oral or written, under the terms of which the employer defendants agreed not to purchase patterned lumber and mill work manufactured under a lower wage scale than that prevailing in the San Francisco Bay Area, including patterned lumber and mill work manufactured in States outside the State of California; * * * such an agreement or understanding would constitute a violation of the Sherman Act as charged in the indictment. It would constitute no defense under the law, either to the employer defendants or to the union defendants that the agreement or understanding may have been arrived at in settlement of a labor dispute; * * *"

These instructions were covered by an overall instruction based upon the rule stated in the Hutcheson case. It is "Labor unions or their members may join together in promoting their self-interest, even though their acts in so doing may result in an undue obstruction of interstate commerce. But they can do this only so long as they act in their self-interest and do not combine with non-labor groups." There is abundant evidence convincing to us as well as to the jury, that the unions did not confine their efforts to promoting their self-interest but combined with the employers, creating a monopoly excluding mill work from other states, for their employers' interest as well. We find no prejudicial error in the instructions.

The judgment against all the appellants, save Ryan, O'Leary, and Helbing is affirmed. As to the latter three, the judgment is reversed and as to them their immunity requires that the indictment should be dismissed.

Affirmed in part and reversed in part.