### UNITED STATES v. LOCAL UNION NO. 3 OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS et al. (three cases).

District Court, S. D. New York.

Dec. 19, 1941.

Thurman Arnold, Asst. Atty. Gen., Herbert A. Berman, Sp. Asst. to the Atty. Gen., and John M. Cole, and Nelson A. Sharfman, Sp. Attys., both of New York City, for the United States.

Harold Stern, Benjamin S. Kirsh, and Walter M. Colleran, all of New York City, for defendants.

CONGER, District Judge.

These are demurrers to three indictments filed against Local Union No. 3 of the International Brotherhood of Electrical Workers and certain of its officers and representatives. Each of the counts in each indictment charges the defendants with violating Section 1 of the Sherman Act 15 U. S.C.A. § 1. The offenses charged in the three indictments are similar in pattern; the question herein is common to all.

The indictments allege that beginning some years prior to the date of the indictments, and continuing during the periods of the conspiracies alleged in the indictments, defendant Local No. 3 succeeded in unionizing substantially all of the concerns in the City of New York engaged in manufacturing, assembling and wiring electrical fixtures, electrical switchboards and panel boards, outlet boxes, conduit fittings and ac-

cessories, used in the construction of buildings in the City of New York; in unionizing substantially all of the contractors employing electricians engaged in the construction of buildings of more than three stories in the City of New York; in unionizing many of such contractors and builders engaged in the construction of lower buildings and many contractors engaged in electrical alteration work; that Local No. 3 has claimed jurisdiction over all inside and outside electrical construction work, and has obtained control of the supply of electricians available to install fixtures, switchboards and panel boards, rigid steel conduit, outlet boxes, conduit fixtures, fittings and accessories in the construction and alteration of New York City buildings and other structures where the work is performed by union labor.

The indictments state that substantially all rigid steel conduit is manufactured outside the State of New York, but outlet boxes, conduit fittings and accessories, switchboards and panel boards and their parts, commercial sheet metal and residential fixtures are manufactured both in and outside of New York State; that prior to the alleged conspiracies contained in these indictments, substantial quantities of these commodities were shipped in interstate commerce into the City of New York for installation, some being ordered and shipped for specific construction jobs and going directly to such jobs, and some being transported to stores, warehouses and shops in the City of New York for redelivery to customers; that beginning sometime prior to 1934, defendants interfered with interstate commerce in these commodities manufactured by certain out-of-state concerns, by the methods described below, and which interference is allegedly in violation of § 1 of the Sherman Act.

The indictments charge that defendants, to accomplish their purpose, have prevented members of Local No. 3 from installing conduit fabricated by such out-of-state manufacturers in New York City buildings and structures, with minor exceptions; have warned purchasers and manufacturers of such conduit that members of Local No. 3 would not install it; have threatened strikes, slow-downs and sympathetic strikes in case of installation of such conduit; have subjected such out-of-state manufacturers to secondary boycotts by causing customers and prospective customers not to do business with them through fear of loss or damage to themselves; have caused curtailment of trade in outlet boxes, conduit fittings and other accessories manufactured by certain out-of-state concerns, with the purpose of diverting work to New York City manufacturers, by requiring all such products manufactured by members of Local No. 3 to be stamped, and prevented Local No. 3 members from installing such products which had not been so stamped in New York City buildings.

The indictments further allege that defendants have used practically the same methods regarding switchboards and panelboards manufactured outside of New York State, and in addition, have required that boards manufactured by out-of-state concerns not employing Local No. 3 members to be unassembled and unwired and reassembled and rewired by members of Local No. 3 before installation in New York City buildings; that defendants have used practically the same methods against commercial and residential fixtures not bearing Local No. 3 identification labels, which were placed only upon the fixtures that were either manufactured by New York City manufacturers, or were assembled in New York City.

It is alleged in each count that the methods used by defendants increased the cost of such fixtures and commodities to the purchaser and discouraged their purchase; that all of which deprived the outside manufacturer of competing in the New York City market without the added costs of the acts and methods used by Local No. 3; and that all of this is in restraint of interstate trade.

Each count of each indictment specifically alleges that: "Said combination and conspiracy did not involve or grow out of any dispute concerning terms or conditions of employment and was not intended to be, and was not, in aid of collective bargaining, higher wages, shorter hours or better working conditions for labor, including members of Local No. 3, or in aid of any other legitimate or normal object of a labor union."

It should be noted that neither Local No. 3 nor any present officer thereof is charged with fraud, violence, racketeering or personal enrichment. There is no charge that the objective sought or the means used were other than peaceful.

The defendants' demurrers set forth, in substance, that the allegations in the indictments do not state facts sufficient to consti-

tute a crime against the United States; that the court has no jurisdiction in the premises; that the acts alleged in the indictments do not constitute a direct restraint of trade within the meaning of the Federal Anti-Trust Laws; and that the acts alleged in the indictments do not constitute an undue or unreasonable restraint of trade within the meaning of the Federal Anti-Trust Laws.

The contention of the defendants is that in view of the decisions of the Supreme Court of the United States and various Circuit Courts of Appeals, there is absolutely no issue left open under the anti-trust laws, and that adherence to the precedents of higher courts compels this court to sustain the demurrers. The government, say the defendants, by these decisions is left absolutely without any legal argument to support these indictments.

■ Section 1 of the Sherman Act provides that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal * * *."

It is contended that this statute was not intended to, and does not, apply to labor unions. The defendants draw the distinction between commercial or business combinations in restraint of trade on the one hand, and labor combinations on the other. The defendants base this distinction on the following excerpts from the language of Mr. Justice (now Chief Justice) Stone in the case of Apex Hosiery Co. v. Leader, 310 U. S. 469, at page 493, 60 S.Ct. 982, at page 992, 84 L.Ed. 1311, 128 A.L.R. 1044, where, in footnote 15, it is stated: "The history of the Sherman Act as contained in the legislative proceedings is emphatic in its support for the conclusion that 'business competition' was the problem considered and that the act was designed to prevent restraints of trade which had a significant effect on such competition."

And in footnote 11 of the same case, 310 U.S. at page 490, 60 S.Ct. at page 990, 84 L.Ed. 1311, 128 A.L.R. 1044: "With few exceptions the articles, scientific and popular, reflected the popular idea that the Act was aimed at the prevention of monopolistic practices and restraints upon trade injurious to purchasers and consumers of goods and services by preservation of. business competition."

And further, at pages 491, 492 of 310 U. S., at page 991 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044, where he states: "It was another and quite a different evil at which the Sherman Act was aimed. It was enacted in the era of 'trusts' and 'combinations' of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern. The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury."

■ A careful reading of the Apex case convinces me that the court never intended to, and did not, make the distinction that defendant contends. While the court found in favor of the labor union, it did not do so because it was a labor union and therefore immune from the provisions of the Sherman Act. This is recognized by Mr. Justice Stone where he stated, at page 487 of 310 U.S., at page 988 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044: "A point strongly urged in behalf of respondents in brief and argument before us is that Congress intended to exclude labor organizations and their activities wholly from the operation of the Sherman Act. To this the short answer must be made that for the thirty-two years which have elapsed since the decision of Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815, this Court, in its efforts to determine the true meaning and application of the Sherman Act has repeatedly held that the words of the act, 'Every contract, combination * * * or conspiracy, in restraint of trade or commerce' do embrace to some extent and in some circumstances labor unions and their activities [citing cases in footnote]; and that during that period Congress, although often asked to do so, has passed no act purporting to exclude labor unions wholly from the operation of the Act. [footnote citing bills introduced in Congress] On the contrary Congress has repeatedly enacted laws restricting or purporting to curtail the application of the Act to labor organizations and their activities, thus recognizing that to

some extent not defined they remain subject to it. [footnote citing legislation]."

And at page 489 of 310 U.S., at page 989 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044, Mr. Justice Stone states that labor unions are to some extent and in some circumstances subject to the act, although the Supreme Court never thought the act applied to all labor union activities affecting interstate commerce. The fact that the Supreme Court in this case did not apply the Sherman Act to the labor organization under the facts and circumstances therein brought forth, does not mean that the court intended to exclude labor unions entirely from the provisions of the anti-trust statutes.

Thus it might be stated that the test is contained in the words of the Sherman Act: "Every * * * combination * * * or conspiracy, in restraint of trade or commerce."

■ The question then arises in the instant case (since the indictment alleges a conspiracy) whether or not the exclusion of out-of-state manufacturers of electrical equipment by the activities of the labor union is the kind of "restraint of trade or commerce" which the Act condemns. As was stated by Mr. Justice Stone in the Apex case, 310 U.S. at pages 500, 501, 60 S.Ct. at page 996, 84 L.Ed. 1311, 128 A.L.R. 1044, "Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition." (Citing cases).

In the second Coronado case (Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963) the Supreme Court held, unanimously, that where the actions of a union were intended to produce a result which materially interfered with interstate commerce and where the intention of the union was to control the supply of the goods involved entering into and moving in interstate commerce or control of the price of such goods in interstate commerce interference based on such intent constitutes a "restraint of trade or commerce" within the act.

■ The indictment herein charges that the defendants participated in a conspiracy with the intent to cut off from the flow of interstate commerce electrical equipment as described therein, by a practical exclusion of them from the New York City area, with the intended result of limiting the use of these products to those manufactured in New York City, by employers hiring only members of their union, and which union members will install only electrical equipment manufactured or assembled in New York City, thus producing a marked increase in the purchase price of the products manufactured outside of New York State for use in New York City. This conspiracy, the government contends, gives the local manufacturer power to control the market price of such goods by virtue of his monopoly, and to enable him thereby to meet all demands of the union as to wages and hours of its employees.

While it may be true, under the facts alleged in the indictment, that out-of-state manufacturers may still ship their electrical products into New York City for sale and installation, nevertheless the prices thereof would be abnormally high due to the alleged activities of the union. It is a natural consequence, assuming the allegations of the indictment to be true, that out-of-state manufacturers cannot sell or install their electrical products in New York City at their normal costs, in free competition with New York City manufacturers, even though their own employees in their out-of-state factories, plants, etc., may be members of other unions. From the indictment it appears that the purpose of Local No. 3 is not to restrict the installation and sale of non-union labor manufactured goods, but to restrict the installation of electrical equipment to that equipment manufactured by its members. Thus, in my opinion, the activities to which these indictments are directed fall directly within the definition contained in the Apex case, and are a restraint "* * to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition."

It must be noted that in the Apex case, the court, in considering whether the effect of the combination or conspiracy was a restraint of trade within the meaning of the Sherman Act, stated: "This is not a case of a labor organization being used by combinations of those engaged in an industry as the means or instrument for suppressing competition or fixing prices." (Citing cases).

It is likewise true in the within indictments, there is no allegation that Local No.

3 or its officers acting on behalf of and in furtherance of the objects of the union, were used by electrical manufacturers, electrical contractors or jobbers of electrical supplies as an instrumentality to suppress competition or fix prices of electrical products in the New York City market.

I believe the indictments herein charge the defendants with a conspiracy in restraint of trade or commerce within the meaning of the Sherman Act.

The defendants insist, further, that even if the indictments do charge a conspiracy or combination in violation of the Sherman Act, the indictments cannot stand under the provisions of Section 20 of the Clayton Act, 29 U.S.C.A. § 52, since the enactment of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115. In support of this contention defendants rely on United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788.[1]

■■ From a reading of the Hutcheson case, I believe the limitations of the Norris-LaGuardia Act to Section 20 of the Clayton Act, prevents prosecution under Section 1 of the Sherman Act for restraints arising out of a "labor dispute" as. defined in the Norris-LaGuardia Act. The Hutcheson case, in my opinion, does not hold that a union is immune from prosecution under the anti-trust laws in any event. Nor does the case overrule the earlier Apex case and hold that a "labor dispute" is necessary to grant immunity from prosecution of labor unions under the anti-trust laws. In the absence of a "labor dispute", the government must still allege and prove that the conspiracy or combination was in restraint of trade within the meaning of the act. The Hutcheson case does hold that where there is a "labor dispute", whether or not it is between employer and employee, the union cannot be prosecuted under the anti-trust laws. The case also holds that " * * * whether trade union conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct." 312 U.S. 219, at page 231, 61 S.Ct. 463, at page 466, 85 L.Ed. 788.

The Norris-LaGuardia Act defines a labor dispute in Section 13(c): "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

And in Sections 13(a) and (b) a "labor dispute" is further explained as to "who" is included. These latter sections are not important in construing the indictments at bar.

■ There is an allegation in each count of each of the within indictments that the alleged restraints do not arise out of a "labor dispute" and are, therefore, not subject to the limitations of the Hutcheson case. But apart from this specific allegation, it is clear from the facts alleged, that the union and its officers are not charged with crimes which on the face of the indictments concern persons or acts involved in a legitimate "labor dispute" as defined in the Norris-LaGuardia Act, and which would exclude the operation of the Sherman Act to these defendants. On the contrary, from the facts alleged, it would appear that there is no "labor dispute" of any kind except the effort of the Local No. 3 to better its own position to the detriment of consumers and other workers (whether union members or not), and of free competitive interstate trade. The crimes charged, involving no "labor dispute", are that defendants have entered into conspiracies which I have heretofore held to be in restraint of trade and commerce; and which restraints are in violation of the provisions of the Sherman Act.

It might be noted that the distinction between what constitutes a "labor dispute" and what does not, in the instant case, may be demonstrated by the fact that regardless of whether the union members worked on goods manufactured in New York City or out-of-state, the terms and conditions of employment remained the same. The union does not contend that the goods excluded were made by non-union labor or that they were made under sweat-shop conditions; nor does it appear that the union attempts a change or improvement of fundamental labor rights anywhere in the industry.

---

[1] See discussion of this case in Iowa Law Review, reprinted in N. Y. Law Journal of October 4th and 6th, 1941.

The alleged activities of the defendants arbitrarily excluded manufacturers of electrical products from the free and open competition of the New York City market; a right which was guaranteed to manufacturers under the common law and which is preserved by the Sherman Act. See cases cited in Apex case, 310 U.S. 469, at page 497, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

The defendants contend, however, that the primary and dominant purpose of the union was the progressive unionization of the various branches of the electrical industry within the City of New York and the maintenance of union standards and conditions which is legal. But from a reading of the indictments, the allegations therein charge more than that; they allege facts which are in restraint of trade within the meaning of the Sherman Act, and therefore a crime.

The case of United States v. Carrozzo, D. C., 37 F.Supp. 191, affirmed without opinion in United States v. International Hod Carriers' and Common Laborers' District Council of Chicago, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508, is not controlling herein since in that case the court found there was a "labor dispute". In the case of United States v. Local 807 of International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America et al., 2 Cir., 118 F.2d 684, certiorari granted, October 13, 1941, 62 S.Ct. 67, 86 L.Ed. ——, the Court found there was no evidence of any concerted agreement to fix prices of trucking or commodities carried, nor evidence that the action of the union and its members had in fact affected those prices. In the case of Gundersheimer's Inc., v. Bakery & Confectionery Workers' International Union of America, 73 App.D.C. 352, 119 F.2d 205, there was no allegation that the alleged restraint by the defendants had any actual or intended effect on price or price competition. In the case at bar the indictment charges the defendants with affecting prices in restraint of interstate trade.

I note with interest the findings and decision of John Kirkland Clark, acting as Special Master, in Allen Bradley Co. v. Local Union No. 3 et al., D.C.S.D.N.Y., 41 F.Supp. 727, in which he recommends the granting of injunctive relief under the Sherman Act against the same activities of these same defendants.

The demurrers are overruled. Settle orders on notice.