ALLEN BRADLEY CO. et al. v. LOCAL UNION NO. 3, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, et al.

No. 339.

Circuit Court of Appeals, Second Circuit.

Oct. 12, 1944.

Writ of Certiorari Granted Jan. 2, 1945.

See 65 S.Ct. 433.

Harold Stern, of New York City (George Rosling, of Brooklyn, N. Y., and Saul Pearce, of New York City, on the brief), for defendants-appellants.

Walter Gordon Merritt, of New York City (McLanahan, Merritt & Ingraham, Burgess Osterhout, and Hyler Connell, all of New York City, on the brief), for plaintiffs-appellees.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Defendants, Local Union No. 3 of the International Brotherhood of Electrical Workers, American Federation of Labor, and certain of its officers, appeal from an order of the district court enjoining various activities of the union and declaring them to be a conspiracy in restraint of trade in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq., and laws amendatory thereof. The enjoined activities constitute in sum any and all actions on the part of the union which would tend to boycott from the New York City area market electrical equipment manufactured by the various plaintiffs.

Plaintiffs filed their complaint below in December, 1935. The following year most of the plaintiffs joined in a companion suit against the union, and additional defendants, for treble damages at law under the Sherman Act; and this has remained pending in the district court without trial. The parties agreed to refer the present action

to a special master for determination of "all issues of law and fact," and it was so ordered. After two and one-half years of hearings, at which, as the master states, more than 400 witnesses were examined, some 1,700 exhibits were presented, and some 25,000 pages of testimony adduced, he filed an opinion, October 2, 1941, in which he discussed the facts and the law, concluding that the plaintiffs should have judgment, and asked the parties to submit proposed findings of fact and conclusions of law, D.C., 41 F.Supp. 727. The parties having complied, the master, on November 23, 1942, filed his final report, containing lengthy findings and conclusions, which, upon cross-petitions to confirm and dismiss, the court below confirmed with some limited alterations and additions to the findings, D.C., 51 F.Supp. 36. The final decree, covering 121 printed pages of the record, included these findings, 374 in number, with 26 conclusions of law, as well as the form of injunction to be issued and the declaratory judgment declaring "that the combination and conspiracy and the acts done and being done down to the date of the conclusion of the taking of testimony herein before the Special Master, in furtherance thereof, all as set forth in the findings of fact as made and adopted by the Court herein, are unlawful and contrary to" the Sherman Act. This appeal is taken upon only the findings and judgment, and hence does not seek any modification of the facts found.[1]

The eleven plaintiffs in the action are manufacturers of electrical equipment whose factories are located for the most part without the New York City area. Several operate under collective bargaining agreements with local unions in their localities. Local 3 is the powerful local for the five boroughs of New York City of the International Brotherhood of Electrical Workers, itself one of the most influential members of the American Federation of Labor. Local 3 possesses approximately 15,000 members, divided into numerous separate classifications. Charter A members, numbering around 7,000, consist generally of journeymen electricians engaged in the fabrication and installation of electrical equipment, while Charter B members, numbering around 8,000, are largely employees of local manufacturers producing electrical equipment. Sole voting power rests in Charter A members, and Charter A membership is entailed for sons and brothers of existing members. Prior to 1928, Local 3 was composed only of the present Charter A members; but the membership now covers virtually everyone working on or producing electrical equipment in any way within the area. Although there are other officers and an executive committee, the nerve center of the union rests in the office of the business manager, who, among other things, has the complete power to select which members shall fill existing job vacancies.

The acts constituting the alleged conspiracy in restraint of trade which resulted in the boycott of plaintiffs' products are all elements of an extensive campaign undertaken by Local 3 to organize the electrical industry in New York City. This occurred with the appointment in 1934 of a new business manager, Harry Van Arsdale, Jr., after the depression years of 1931 to 1934 had left building at a standstill in New York City and found the union with only a quarter of its members employed. Thereafter year by year, as the master reports, Van Arsdale fought for, and gradually obtained for the union members, a reduction in the number of hours of work per

---

[1] These union activities appear to have been in other litigation in the court below. They were the subject of four indictments against the union and its officers and others under the Sherman Act, which were sustained upon demurrer as not involving a "labor dispute" within the statutory exemption hereinafter discussed. United States v. Local Union No. 3, D.C.S.D. N.Y., 42 F.Supp. 783; United States v. New York Electrical Contractors Ass'n, D.C.S.D.N.Y., 42 F.Supp. 789; cf. 42 Col. L.Rev. 1067, 40 Mich.L.Rev. 1244. The court records show, however, that petitions for reargument were filed by defendants after the decision in United States v. American Federation of Musicians, 318 U.S. 741, 63 S.Ct. 665, 87 L.Ed. 1120, discussed below; and thereafter on September 22, 1943, the cases were nol prossed. Slightly earlier a union affiliated with the C. I. O. sought an injunction forbidding its boycott by Local Union No. 3, the International Brotherhood of Electrical Workers, and others, and basing its action upon claimed rights under the National Labor Relations Act; but it was unsuccessful. United Electrical, R. & Mach. Workers v. International B. of E. Workers, 2 Cir., 115 F.2d 488, affirming D.C.S.D.N.Y., 30 F. Supp. 927; cf. 54 Harv.L.Rev. 513; Boudin, Representatives of Their Own Choosing, 38 Ill.L.Rev. 41, 47. The master's opinion herein is discussed in 28 Va.L.Rev. 554 and 5 U.Det.L.J. 132.

week at the basic rate of compensation, as well as an increase in the rate of compensation. Meanwhile the membership of the union greatly increased, so that it was highly successful in unionizing and in obtaining closed-shop agreements in both the local manufacturing and the local contracting branches of the electrical equipment industry. The findings then show that "agreements and understandings" entered into by the three groups—manufacturers, contractors, and union—gave them a complete monopoly which they used to boycott the equipment manufactured by the plaintiffs.

While the boycott as found ran the gamut of electrical equipment from highly complicated switchboards and control devices down to novelty lamp shades, the case of the modern switchboard is offered as typical. There are in New York City a number of companies manufacturing switchboards who, before these activities of Local 3, shared an open competitive market with many of plaintiffs. In return for a closed-shop agreement calling for higher wages and shorter hours for employees, however, Local 3 promised these local companies an exclusive market for switchboards within the city, so that they could name their own prices to offset increased production costs. Local 3 carried out its promise with the help of the electrical contractors. It had already won closed-shop agreements from a vast majority of the latter through a series of strikes, threatened strikes, and sympathetic strikes by other unions in the building trade, which threatened to tie up all construction work in New York City. It now secured the further terms that union members should work only on switchboards of local manufacture by union shops, and that the contractors should have the sole power to buy materials for any job, with a proviso as additional protection that only products bearing the union label would be utilized. Like the manufacturers, the contractors were not averse to the extra expense of union material and labor, when all competition was thus removed from the field.

The contractors, however, went so far as to organize a voluntary Code of Fair Competition, which stipulated that every contractor should file with the code committee (upon which two officials of the union sat)

every bid made by him on any work authorized in New York City, that he must include in his bid 35% of the labor cost for overhead, 10% of the materials' cost for commission, and 6% of the total for management, with price cutting penalized by substantial fines. This code was a part of the union contract with several contractor associations in 1935, but it was disapproved by the International President of the I. B. E. W. and the record is not entirely clear whether thereafter it remained a part of the union contract until the contractors themselves gave it up in 1939.[2] At any rate, it is found that the union filed no complaints under the code and did not share in the fines or itself take any action against a contractor or cause its members to refuse to stay in the employ of disciplined contractors.

In other fields, with respect to other items of electrical equipment, a similar situation was found to prevail. Only when no local unionized manufacturer made an article was its use permitted; and in such cases, if at all feasible, it was required either that the article come from the manufacturer "knocked down," to be put together by union labor, or that the finished article be unwired and rewired upon receipt. For years it has been more economical for the manufacturer to wire at the factory such articles as lighting fixtures and control equipment; but the union required the wiring to be done by its own members on the job, even though, in the case of control equipment, the manufacturer had to complete the wiring before shipment for testing purposes. Curiously, a similar requirement was also in force with regard to some equipment manufactured by Local 3 members in closed Local 3 shops. Switchboards, for example, had to be "knocked down" at the factory and reassembled at the job.

All in all, the situation disclosed by the findings is that of an entire industry in a local area, quite dominated and closed to outsiders by a powerful union, whose members receive as a result exceedingly higher wages, shorter working hours, and improved working conditions, and whose copartners—the local manufacturers and contractors—also gain by the greater profits achieved through the stifling of competition. This has been accomplished

---

[2] The master's opinion states only that there was a sharp conflict in the evidence; the findings, however, are general and conclusory to the effect that the union was bound by the code.

by the traditional labor weapons of refusal to work upon disfavored goods, with peaceful and non-violent[3] persuasion, picketing, and blacklisting, and now the active participation of the local employers. The boycott, however, is virtually complete against manufacturers, such as plaintiffs, who have no working agreements with Local 3. It makes no difference that most of plaintiffs are located without the jurisdiction of Local 3 and hence could never bargain collectively with it in any event, or that some of plaintiffs are already working under harmonious agreements with other unions. Moreover, as must be expected in cases where a local area is thus closed to outside products, the persons injured will include not only the excluded manufacturers and rival unions, but also—at least initially and very likely continuously—the consuming public, which must pay higher rates (as, indeed, it must also for raising of wages and lowering of hours of work) and does not receive the benefits of improved machinery or methods of operation. Thus it appears that general electrical work and equipment are costly in New York City, and instances are cited where equipment of plaintiffs was turned down for local equipment with the union label at twice or three times the cost. Since the lowest bidder no longer gets city contracts, if it be not a union bid, the city has lost federal grants, which were premised upon acceptance of the lowest bid. An outstanding example of the consequences from this type of economic warfare to third persons is that of one local manufacturer which has two price lists for its products, one for union use within the city at more than twice the price of the other for use without the jurisdiction.

■ This is only a brief, but, as we believe, a presently adequate, summary of the many pages of record devoted to a statement of the facts. The industry of counsel and of the special master is to be commended; but we are constrained to say that the very verbosity and superfluity of the findings have not aided decision as much as doubtless had been expected. We have had occasion to point out recently that findings,

prepared after decision by winning counsel, even though accepted by the court, are not as helpful as the trier's own original views; and this is particularly true when the findings are lengthy and repetitious. Matton Oil Transfer Corp. v. The Dynamic, 2 Cir., 123 F.2d 999, 1001; United States v. Forness, 2 Cir., 125 F.2d 928, 942, certiorari denied City of Salamanca v. United States, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764; Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992, 996; cf. Preliminary Draft of Proposed Amendments to Rules of Civil Procedure for the District Courts of the United States, 1944, p. 59. Here there is an added difficulty in the incorporation of all the findings in the judgment and their inclusion by express statement in the declaration of invalidity and by implication in the prohibition of the injunction. Doubtless this was done to satisfy requirements that an injunctive order must set forth the reasons for its issuance and describe in reasonable detail the acts to be restrained, Federal Rule 65(d), 28 U.S.C.A. following section 723c, continuing 28 U.S. C.A. § 383, cf. 29 U.S.C.A. § 109; but a multiplicity of words is as little revealing as a dearth of words. Labor union officers and members are entitled to a more direct and succinct statement of the illegalities of which they are held guilty and which they must cease under penalties of fine and imprisonment. This basic requirement assumes the greater importance here because the course of decision below has left the case not free of ambiguity on a crucial feature. For, as we shall point out, recent decisions have conceded labor unions quite broad powers to refuse to work and to employ peaceful persuasion, but have left open the effect of combinations or conspiracies of unions with non-union elements, particularly for non-union objectives. Thus the nature and purpose of the conspiracies here may quite possibly be the crux of the case.

This ambiguity as to the importance here of the element of conspiracy with non-labor groups—as against other more traditional labor-union activities—appar-

---

[3] The absence of violence is significantly emphasized by the finding that "Local No. 3 has encouraged disorder and lawlessness on the part of its members in connection with the above activities by guaranteeing them bail and counsel furnished at the expense of the union in case of their arrest" and has so spent sums for bail and counsel fees for members, as well as by a specific finding that there was no evidence of any violence or any threat of violence against any of the plaintiffs by any of the defendants.

ently stems from a real change in emphasis as the case progressed. Indeed, such a change was but natural, if not necessary, because of the complete reversal of the controlling judicial precedents during the long pendency of this litigation. In the original complaint of 1935 the stress is on union power which has forced the contractors to employ only union labor and "through their [defendants'] said control over said electrical contractors" has coerced the latter not to purchase electrical equipment wired or assembled wholly or partly by non-union men outside the Metropolitan Area. And the prayer for injunction—important because it is, except for limited additions hereinafter noted, the injunction ultimately granted—was against the inducing of persons not to work upon plaintiffs' products, with no direct prohibition of conspiring with non-union groups and indeed no reference to such groups unless possibly under the vague term "confederates." Significantly, no non-union co-conspirator was joined as a party defendant and none has since been added. The expanded amended complaint of 1937 does set forth at considerable length allegations of contracts with the electrical contractors who, however, were said "to have been and now are, forced, compelled and coerced by Local 3 to enter into" these contracts for the conduct of their business in the Metropolitan Area and restricting their choice as to the manufacturers from whom they would make their purchases of electrical equipment. And the requested form of injunction remained as in the complaint. The master's opinion stressed the union's economic power, which had not merely obtained higher wages and shorter hours of labor, but had brought submission and then complaisant and active participation from the local employers. The voluminous findings filed in 1942 make much more of the conspiracy, or conspiracies; and several conclusory findings allege an intent to give the local manufacturers and contractors power to control the market and the market price. The injunction as granted, however, accepts, with slight and unimportant changes of wording, the original eight subparagraphs as prayed for in the complaint, and merely adds two more: a 9th against making, carrying out, or seeking to secure the observance "of agreements or understandings with contractors, manufacturers, or others, restraining, hindering or preventing" the purchase or use of plaintiffs' electrical equipment on the ground that it was not made in New York City or worked on by members of Local 3 or was in competition with equipment made by manufacturers employing members of Local 3; and a 10th against "any action whatsoever" hindering the purchase or use of plaintiffs' equipment on the same grounds as stated in the 9th. The broad scope of the injunction is such as to reach peaceful attempts by the defendants—among whom are included the individual officers of the union—to induce any person (thus even a union member) not to deal with plaintiffs, while it is most doubtful if the unnamed "confederates" are reached at all. Cf. Federal Rule 65(d), supra.

Nevertheless, on any judicious view of the case, we do not believe the motive or intent of defendants can be at all in doubt; and we are left only to appraise its legal validity and effect. That the union and its officers were acting wantonly, corruptly, or even benevolently for the mere benefit of their copartners, and were not at all times acting for what they conceived to be the self-interest of the union and its members, is nowhere asserted, but is negatived by the general import of all the findings and explicitly by several, of which Finding 361 is typical. That finding, after stating that the defendants and those acting in concert with them were "in no way concerned with the working conditions, rates of wages or union affiliations of the employees in plaintiffs' factories outside the Metropolitan Area," continues: "The ban on the plaintiffs' products is and has been imposed and maintained by the aforesaid combination of the defendants, the local union contractors and the local union manufacturers, solely because the plaintiffs do not, or because of their geographical location outside the Metropolitan Area cannot, employ members of Local No. 3 in their factories outside the Metropolitan Area." In other words it was a make-work campaign for the benefit of union members.

For half a century and against strong popular, political, and legislative pressure, the courts struggled to resolve the anomaly of applying a statute forbidding combinations in restraint of trade to a social organism which must depend on united effort for its existence and upon at least certain restraints of trade as a reason for its being. Finally, at long length, the Supreme Court boldly announced what must be taken as an abandonment of the-

attempt. The case which most significantly marks this change is United States v. Hutcheson, 312 U.S. 219, 231, 236, 61 S.Ct. 463, 466, 468, 85 L.Ed. 788, where the majority of the Court through Mr. Justice Frankfurter made clear that the Sherman, Clayton, and Norris-LaGuardia Acts must be read together as "interlacing statutes" presenting "a harmonizing text of outlawry of labor conduct," and that "the Norris-LaGuardia Act reasserted the original purpose of the Clayton Act by infusing into it the immunized trade union activities as redefined by the later Act."[4] Hence the test of lawful union activities in the famous Section 20 of the Clayton Act, 29 U.S.C.A. § 52—which had been held merely declaratory of existing law in decisions such as Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196—is now to be given full effect, contrary to the holdings of the earlier cases, as stating permissible union activities in any "labor dispute" within the broad definition of that term of the Norris-LaGuardia Act, 29 U.S.C.A. § 113, as applied in cases such as Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63, and New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012. Hereafter, following the terms of these Acts, it can no longer be considered illegal for any person or persons, singly or in concert, to cease or refuse to perform any work or labor or peacefully to persuade any person to work or abstain from working, or to cease to patronize any party to such a dispute, or to recommend, advise, or persuade others by peaceful and lawful means so to do. 29 U.S.C.A. §§ 52, 104. And a labor dispute includes, inter alia, "any controversy concerning terms or conditions of employment * * * regardless of whether or not the disputants stand in the proximate relation of employer and employee"; and a case grows out of a labor dispute when it involves persons engaged "in the same industry, trade, craft, or occupation; or have direct or indirect interests therein," whether it is between employers and employees, or employers and employers, or employees and employees, or associations of each, or when it involves "any conflicting or competing interests" of persons "participating or interested" in the dispute. 29 U.S.C.A. § 113.

That the Court is now settled in its present view of the inapplicability of the Sherman Act even to labor controversies whose most injurious effects may be to others than the immediate parties is made clear by later important and unanimous decisions. The Hutcheson case itself immunized against prosecution under the Act a strike and boycott against a brewery company arising out of a jurisdictional dispute between two unions as to building construction work being done for it and for its adjoining tenant. Shortly thereafter the Court affirmed dismissals of other indictments, in per curiam opinions which merely cited the Hutcheson case. United States v. Building & Construction Trades Council, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508; United States v. United Brotherhood of Carpenters & Joiners, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508; United States v. International Hod Carriers', etc., Council, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508, affirming United States

---

[4] This is one of the most discussed cases of recent times; compare, inter alia, Gregory, The New Sherman-Clayton-Norris-LaGuardia Act, 8 U.Chi.L.Rev. 503; Steffen, Labor Activities in Restraint of Trade: The Hutcheson Case, 36 Ill.L. Rev. 1; Nathanson and Wirtz, The Hutcheson Case, 36 Ill.L.Rev. 41; Blum, Labor Provisions of the Clayton Act Revived, 29 Geo.L.J. 770; Lippert, Jurisdictional Dispute Between Labor Unions in Restraint of Trade—Immunity from Prosecution Under Anti-Trust Laws, 4 U. Det.L.J. 209; Carey, The Apex and Hutcheson Cases, 25 Minn.L.Rev. 915; Teller, Federal Intervention in Labor Disputes and Collective Bargaining—the Hutcheson Case, 40 Mich.L.Rev. 24; Stockham, The Hutcheson Case, 26 Wash. U.L.Q. 375; Notes, 27 Va.L.Rev. 835; 41 Col.L.Rev. 532; 9 Geo.Wash.L.Rev. 724; 3 La.L.Rev. 646; 89 U.Pa.L.Rev. 827; 10 Fordham L.Rev. 268; 26 Iowa L. Rev. 862; 54 Harv.L.Rev. 887.

Among helpful discussions of the general problem may be cited Gregory, The Sherman Act v. Labor, 8 U.Chi.L.Rev. 222; Cavers, Labor v. The Sherman Act, 8 U. Chi.L.Rev. 246; Schmidt, Application of the Antitrust Laws to Labor—A New Era, 19 Tex.L.Rev. 256; Newman, Restraint of Trade: Labor Disputes and the Sherman Act, 29 Calif.L.Rev. 399; Tunks, A New Federal Charter for Trade Unionism, 41 Col.L.Rev. 969; Gregory, Union Peacetime Restraints in Collective Bargaining, 10 U. Chi.L.Rev. 177; Comment, Labor Activities under the Sherman Act, 35 Ill.L.Rev. 424.

v. Carrozzo, D.C.N.D.Ill., 37 F.Supp. 191. The latter case is particularly instructive because, as the opinion below shows, it involved a charge of conspiracy as against unions and their members to prevent the sale and use in the Chicago area of labor-saving machinery (truck mixers) or in the alternative to force the employment of the same number of workmen as before the use of the machinery. Further, the defendants were charged with having obtained "working agreements" with the Chicago contractors to this effect. Finally in the controlling case of United States v. American Federation of Musicians, 318 U.S. 741, 63 S.Ct. 665, 87 L.Ed. 1120, the Court affirmed the dismissal in D.C.N.D. Ill., 47 F.Supp. 304, 305, of an action for an injunction brought by the United States against a nation-wide boycott by musicians and their union of recorded music supplanting their services; it did this merely on citation of the Norris-LaGuardia Act and the New Negro Alliance and Milk Wagon Drivers' Union cases, supra. In this case the union comprised "virtually all musicians in the nation who make music for hire"; and it was charged not only with conspiring to prevent the use of "canned music" by radio broadcasting stations, in juke boxes in various establishments, and in the home, but also with accomplishing its purposes through coercion exercised on the record-making companies by notifying them that the union members would not make musical records. Of course, the union was not interested in the working conditions of the employees of the record manufacturers or the radio stations, but was interested in providing work for its members; and it enforced its boycott in a national, not in a purely local, market.[5]

■ These cases, as well as earlier ones,[6] are too closely similar to the case at bar, indeed going beyond it in some aspects, to permit the broad adjudication of illegality here and the injunction based upon it to stand. That this is a labor dispute within the statutory definition follows from the precedents. If a dispute as to the conditions of work between a union and employers still remains a labor dispute as to third persons interested therein or injured thereby, its complexion is hardly changed by a settlement—possibly only an armistice, not a treaty—between the original parties which hurts the third persons more than did the original controversy. United States v. International Hod Carriers', etc., Council, supra; Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., supra, 311 U.S. at page 99, 61 S.Ct. at page 126, 85 L.Ed. 63.[7] The decision in Columbia River Packers' Ass'n v. Hinton, 315 U.S. 143, 147, 62 S.Ct. 520, 522, 86 L.Ed. 750, strongly relied on by the plaintiffs and the court below, is not to the contrary; for there the controversy was between a processor of fish on the one hand, and independent fishermen and their association, on the other. The Court emphasized that the defendants' desire was "to continue to operate as independent

---

[5] In Apex Hosiery Co. v. Leader, 310 U. S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, in denying recovery by a hosiery company for stoppage of its business by a sitdown strike, accompanied by violence, by non-employees of the company, Mr. Justice Stone, speaking for a majority of the Court, held that there must be a cessation of interstate traffic on a substantial scale, and that the purpose or intent of a union was not a decisive factor to a violation of the Act. This test of substantiality of the interruption of interstate commerce was not accepted as ultimately decisive, at least with respect to statutorily permitted labor activities, by the majority in the Hutcheson case, though Justice Stone still relied on it as the ground of his concurring opinion. Finally the Musicians case by the unanimous Court settled that an effective boycott on even a nationwide scale is not alone adequate.

[6] Refusing to interfere, e.g., with picketing by an organization for the advancement of the negro of a grocery discriminating against the employment of negroes, New Negro Alliance v. Sanitary Grocery Co., supra, or with picketing by a milk wagon drivers' union of retail stores selling milk, to reduce or eliminate milk deliveries from the dairies to such stores—of course to the direct benefit of the union members' employees, as well as the members themselves—Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., supra, or with a sitdown strike by non-employees, Apex Hosiery Co. v. Leader, supra, note 5.

[7] In the latter case the Court said that the controversy did not cease to be a labor dispute because the plaintiff dairies' employees became organized, for this merely transformed defendants' activities into a conflict which included a controversy between two unions—an aspect present in the case at bar, though not immediately before the court in this action. See note 1, supra.

businessmen"; the dispute related "solely to the sale of fish," and hence was unlike those involved in earlier cases, where the employer-employee relationship was "the matrix of the controversy." The fact that some of the fishermen had a small number of employees who were also members of their association did not alter the essential nature of the controversy. So in American Medical Ass'n v. United States, 317 U.S. 519, 533-536, 63 S.Ct. 326, 87 L.Ed. 434, the professional association was interested solely in preventing the operation of a business conducted in corporate form by Group Health Association, Inc., not in the terms and conditions upon which the latter employed its physicians. Here, however, the defendant union is admittedly a bona fide labor organization; and the "conditions" of the employment of its members by the local manufacturers and contractors are "the matrix of the controversy," indeed the very thing which causes the plaintiffs their injuries.[8]

■ It seems clear, therefore, that the union members may refuse to work upon the plaintiffs' products; and, in view of the position of economic power which the union has now attained, that privilege is for practical purposes an almost complete shield for the defendants' acts which are most injurious to the plaintiffs. For all the other acts charged against the defendants may be barred; and yet if the union can hold its ranks together and keep its members from working upon plaintiffs' products, the Metropolitan Area will still be closed to them. The injunction does not purport to interfere with that privilege directly, though it comes close to doing so in the provisions, clearly too broad, which forbid the union officers from inducing anyone, even members, from thus doing what it and they may legally do. Moreover, peaceful persuasion, even of others, is clearly within the now applicable statutory terms. Indeed, the injunction is so far contrary to the statute that its mandate might well have been stated in the converse of the terms of the Clayton Act, § 20, viz., as restraining Local 3 and its officers "from terminating any relation of employment,

or from ceasing to perform any work or labor * * * or from ceasing to patronize * * * any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do." 29 U.S.C.A. § 52, supra. And the vague scope of the declaratory judgment is even more indefinitely inclusive, in terms reaching all the activities of the defendants set forth in the findings.

If the present judgment and injunction must therefore fall, should they be reframed to reach only the asserted conspiracies with the local manufacturers and contractors? Such a result would obviously call for the most discriminating draftsmanship for the injunction, to make quite clear what was still permissible, to avoid all difficulties as to the extent of its reach in view of the failure to include the co-conspirators, and to define the objectionable union purpose and intent which, rather than the consequences of defendants' acts, now would become crucial, though proof adequate to justify enforcement by way of contempt proceedings would be hard to secure. But more important is the fact that such an injunction, though on its face so seemingly far-reaching, would after all be of limited effect. For under it, compliance to the extent of public dissolution of all the agreements would satisfy the legal formalities; but still if the union continued its boycott of plaintiffs' products, conditions would remain substantially as before. Such an inconclusive result can hardly fail to add to the bitterness between the parties; one can easily foresee the almost impossible position of the court in attempting fairly to pass upon the proceedings in contempt which would inevitably follow. We do not think the precedents are correctly interpreted to require an effort so vain and useless.

The doctrine that a union necessarily forfeits the benefits of its statutory exemption from the antitrust laws when it combines with non-labor groups, which has been asserted by some authorities, is rested upon a reading in the most extensive form possible of a limitation noted by Mr. Justice Frankfurter to the doctrine stated

8 Cf. Donnelly Garment Co. v. Dubinsky, D.C.W.D.Mo., 55 F.Supp. 587, 601; also 42 Col.L.Rev. 702, 1067; 56 Harv. L.Rev. 479; 10 U.Chi.L.Rev. 216. The more limited rule announced under the state statute in Opera on Tour v. Weber, 285 N.Y. 348, 34 N.E.2d 349, 136 A.L.R. 267, certiorari denied Weber v. Opera on Tour, 314 U.S. 716, 62 S.Ct. 477, 86 L.Ed. 570, is ably criticized by Lehman, C. J., for the minority; and see also, inter alia, 41 Col.L.Rev. 1266, 42 Col.L.Rev. 51, 66-68, 51 Yale L.J. 144, 27 Corn.L.Q. 115, 39 Mich.L.Rev. 665, and 28 Va.L.Rev. 727.

224

in the Hutcheson case, as follows: "So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." And then to the word "groups" he dropped a footnote, which reads: "Cf. United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403, involving a conspiracy of mill work manufacturers, building contractors and union carpenters." 312 U.S. at page 232, 61 S.Ct. at page 466, 85 L.Ed. 788. The Brims case affirmed the conviction of union members in the Chicago area who refused to work on non-union out-of-state mill work, with the result that an exclusive market was established for the local manufacturers; and the argument is that by these words of the Court the Brims case is still left in unabated force.[9]

Now it is doubtful if Justice Frankfurter intended to define precisely just the extent of the limitation the Court had in mind. There was no necessity for him to do so at that time; and the matter had ramifications which the Court would not be likely to dispose of cavalierly. Hence the excepting sentence doubtless should not be read with exacting literalness; but in view of the use which has been made of it, we should note that it is not a positive affirmation, but a statement of only restricted reach. If its converse is to be accepted as an affirmative, it is not that combinations with non-labor groups are taboo, but only that when a union no longer acts in its self-interest and does so combine, then the licit and the illicit may have to be determined by a judgment as to the rightness or wrongness, etc., of the union end or purpose. Such a truism would seem still of undoubted validity; for the Hutcheson case did not purport to remove all rulings whatsoever upon labor activities. Thus, acts of violence are not protected by the statutes; nor, in any sound view, should labor union activities be usable merely as a blind or cloak for illegality. Thus, in Albrecht v. Kinsella, 7 Cir., 119 F.2d 1003, 1004, 1005, the court said: "Labor unions as such were here involved only in name—and the name of labor was being used as a shield or blind behind which a venal group was hiding and at the same time levying tribute upon industry, business, and home builders. * * * When officials of the labor union step outside their union labor fields and act as highway men, levying tribute on those who wish to build homes or other buildings, acting for their individual gain, the immunity granted to labor unions under the amendment to the Sherman Act does not extend to them." 'And the court went on to say: "The test is whether the activity complained of is one promotive of, and within the scope of, the legitimate objects of a labor union or whether the union is being misused by those holding official position or positions of trust therein, who, conspiring for their private and their personal profit, are using the union name to obtain immunity from Sherman Act prosecutions and at the same time shield their misconduct behind an organization whose fair name and activities are likely to mislead a court or jury as well as the public."[10]

---

[9] The Apex case, supra, note 5, 310 U. S. at page 501, 60 S.Ct. at page 996, 84 L.Ed. 1311, 128 A.L.R. 1044, also cites the Brims case, but in like reserved language—"a case of a labor organization being used by combinations of those engaged in an industry as the means or instrument for suppressing competition or fixing prices." Early comments after the Hutcheson case, supra, note 4, were inclined to view the exception broadly; and there were some cases in accord, e. g., United States v. Central Supply Ass'n, D.C.Ohio, 40 F.Supp. 964; United States v. Associated Plumbing & Heating Merchants, D.C.Wash., 38 F.Supp. 769. Later comment and decision have been more restrained, cf. note 10, infra.

[10] See also United States v. Bay Area Painters & Dec. Joint Committee, D. C.N.D.Cal., 49 F.Supp. 733, 738, saying "it would seem beyond belief" that Congress, having carefully protected the machinery of collective bargaining, would then after the bargain has been made withdraw that protection and leave the parties liable for prosecution for criminal conspiracy, and distinguishing United States v. Lumber Products Ass'n, D. C.N.D.Cal., 42 F.Supp. 910, affirmed in part 9 Cir., 144 F.2d 546; and cf. United States v. B. Goedde & Co., D.C.Ill., 40 F.Supp. 523, and comments in 9 U.Chi. L.Rev. 342 and 16 U.Cin.L.Rev. 51, and the earlier case of Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L. Ed. 804. See also discriminating discussion in Gregory, op.cit. supra, note 4, 10 U.Chi.L.Rev. at pages 187–190; Tunks, op.cit. supra, note 4, 41 Col.L. Rev. at pages 1011–1012; 42 Col.L.Rev. 1067, 1070–1071; 40 Mich.L.Rev. 1244;

It seems to us that this is the distinction the Supreme Court had in mind in its reference to the Brims case, and that the latter cannot now be held as broadly applicable as perhaps it was originally. As one commentator puts it, the Brims case "should be deflated to its position as one of a line of cases uncritically condemning refusal to work on non-union products delivered in interstate commerce"—a position no longer tenable in the form stated—and that "when the union is permitted to act alone, an agreement with employers should not automatically add the condemnable virus." Tunks, A New Federal Charter for Trade Unionism, 41 Col.L.Rev. 969, 1012.[11] This distinction seems to us the logical deduction to be made from the present state of Supreme Court decisions, and to be consistent with the statutes upon which the Court relies, and which do not in terms exclude business-labor combinations, but, as we have seen, do extend the inclusive labor dispute to include employment interests not themselves primarily engaged in a controversy as to terms and conditions of employment. On this basis it would follow that here the activities which cannot be forbidden to Local 3 acting by itself are not to be interdicted because other groups join with them to the same end.

That the present state of the authorities is such as to leave the harshness of the economic struggle to bear with unusual weight upon the consuming public has been the conclusion of commentators who have urged legislative action to check some of the abuses of power which exist.[12] But the making of ground rules for business competition is difficult in any case, as shown by current discussions of such matters as patent monopolies and the issue of compulsory licensing to prevent the use of patents to retard new inventions; and the problems are immeasurably increased with the addition of the explosive elements of attempted regulation of organized labor. Indeed, advocates of legislative reform seem not agreed as to whether it should take the course of external controls of conduct towards third persons or internal regulation of union affairs. The determination of such questions of policy is, of course, no proper function of the courts; we mention the matter to indicate that we are not unaware of the disturbing consequences

---

cf. Merritt, Two Federal Legislatures, 30 A.B.A.J. 371, 380. Compare also the suggestion in Boudin, Organized Labor and the Clayton Act, 29 Va.L.Rev. 272, 395, that, when the union is used for the mere benefit of non-labor groups, then the union officers, and not the union, should be liable.

The Lumber Products case, supra, was an extensive prosecution of various trade associations, corporations, and individuals comprising the "Manufacturer Group," and various trade councils, unions, international and local, and officers and agents comprising the "Union Group" who were charged with having entered into a written agreement, following a demand in 1936 for a wage increase, to shut out from the San Francisco area all millwork and patterned lumber produced outside the area, although at least 80% had previously come from without the state, chiefly from Washington and Oregon. Indictments having been sustained, the "Manufacturer Group" pleaded nolo contendere and the union groups were found guilty by a jury after trial. Upon appeal the convictions were sustained (except as to three individuals), the court holding the agreement one not to secure any legitimate advance of the laborer's interest, but to extort a "capital levy on the home builder" and a "monopoly price tribute from the consumer" and, relying upon the Brims case, to the effect that labor and the employer may not agree to give the latter a monopoly price-fixing contract and thereafter "split the take." Hence the history, the scope, and the purpose of the fixed written agreement, as stated by the court—all tend to differentiate that case from the present (compare the nol prossing of indictments, as stated in note 1, supra), while the present issue of framing an injunction of fixed regulation of future union activities differs markedly from that of finding evidence to sustain a jury's verdict of guilt. Nevertheless, with deference one may question the present extent of the Brims doctrine as here restated, or the view that a labor dispute loses its character as such as soon as a collective bargain is made. Compare the views of the same district judge in the Bay Area Painters case, supra.

[11] For like comments, see note 10, supra.

[12] As in Gregory, op.cit. supra, note 4, 10 U.Chi.L.Rev. 177; Teller, op.cit. supra, note 4; 9 Geo.Wash.L.Rev. 948-961; 41 Col.L.Rev. 529, 532; 49 Yale L.J. 518, 534; and the series of Ross Prize Essays in 28 A.B.A.J. 385, 471, 531, 594. But cf. Tunks, op.cit. supra, note 4; Shulman, Labor and the Anti-Trust Laws, 34 Ill.L.Rev. 769.

to the parties involved of judicial non-interference which, however, in the light of experience seems likely to be less costly to stable social institutions than judicial attempts to resolve these problems without the aid of, if not contrary to, legislative direction.

Judgment reversed and action dismissed.

SWAN, Circuit Judge (dissenting).

I do not read the Supreme Court cases as requiring us to hold that none of the conduct of the appellants, as found by the special master and the district court, can be deemed a violation of the anti-trust laws. The members of a labor union are privileged to agree among themselves upon a boycott, although the effect of it may be to restrain interstate commerce, when the purpose of their boycott is to make work for themselves, or improve working conditions or strengthen their union as against a competing union; but I do not think it has yet been held that they may agree with their employers to enforce a boycott for the very purpose of restraining commerce and increasing the price of articles manufactured or dealt in by their employers within a local market area. As I read the findings of fact the case at bar falls within the latter classification. Among the findings supporting this view the following may be quoted:

"353. The combination and conspiracy hereinbefore described was intended to and did give the local union manufacturers power to control the market price of their products as a result of their monopoly and was intended to and did give the union contractors exclusive purchasing rights to all electrical equipment for installation and contracts involving larger sums of money wherewith to add to their profits."

"359. The purpose of the defendants and those participating with them, in conducting the boycott is, in so far as is practicable, to exclude from the New York City market all electrical equipment unless it is manufactured or built by members of Local No. 3, employed by either local union manufacturers in the factory or by local union contractors on the job where the equipment is to be installed."

"366. All the acts of the defendants and those acting in concert with them were calculated and intended to prevent and destroy all interstate commerce in electri-cal equipment of such kinds as can be and are manufactured by local union manufacturers or built on the job by local union contractors, in order thereby to secure a monopoly for the members of Local No. 3 and for their employers, the union electrical contractors and the union electrical manufacturers, of the work of manufacturing in whole or in part such types of electrical equipment to be used in the City of New York."

"368. A desire or intention by the conspirators to bring about any modification of the standards or terms of wages, hours, or working conditions, or employment relations maintained by the plaintiffs, or any of them, in any of their factories outside the Metropolitan Area, did not in any way motivate the conspirators in boycotting the plaintiffs' products."

In my opinion the facts found by the trial court make applicable the principle of United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403, involving a conspiracy of mill work manufacturers, building contractors and a carpenters' union. Neither the Clayton Act nor the Norris-LaGuardia Act has rendered that case obsolete, as recent opinions of the Supreme Court plainly show. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 501, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. 463, 85 L.Ed. 788. The ninth circuit has just applied the rule of United States v. Brims, supra, to facts very similar to those of the case at bar. Lumber Products Ass'n v. United States, 9 Cir., 144 F.2d 546. I think that we should likewise apply it. Until the contrary shall be authoritatively determined, I am unwilling to believe that the congressional legislation exempting labor unions from injunctions was intended to go so far as to permit employers and employees to combine to do what neither the City of New York by municipal ordinance nor the State of New York by legislative fiat could lawfully do, namely, exclude manufactured articles from the local market merely because they were manufactured outside the state. I agree with my colleagues that the injunction was granted in term too broad, but I cannot agree that no injunction whatever is permissible or that the prayer for a declaratory judgment should be denied. I therefore dissent from dismissal of the complaint.